GERALDINE F. PRATT FOR THE ADOPTION OF GERRI LEIGH GRAHAM
v. GEORGE W. BISHOP.

(Filed 10 July 1962.)

**1. Appeal and Error § 19—**

Assignments of error must clearly present within themselves the alleged errors relied on without the necessity of an examination of the record, and assignments of error which do not point out the matters complained of but refer only to the exceptions and the page of the record where the matter is set forth, are ineffectual. Rule of Practice in the Supreme Court, No. 19(3).

**2. Appeal and Error § 40—**

Where respondent is permitted to read not only the portion of his answer denying the material allegations of the petition but also his further answer, except for certain portions which are clearly improper and would have been stricken upon motion, respondent is not prejudiced by the refusal of the court to permit him to read to the jury each paragraph of the answer.

**3. Pleadings § 14—**

A demurrer which merely charges that the petition fails to state a cause of action is a broadside demurrer and ineffectual, it being required that a demurrer point out specifically the alleged defects of the pleading.

**4. Adoption § 3—**

Where a proceeding for the adoption of a child is predicated upon abandonment of the child by its parent, it is the better practice for the petition to allege that the parent had wilfully abandoned the child during the six consecutive months immediately preceding the institution of the proceeding, but allegations to the effect that the parent had abandoned the child continuously since its birth three years prior to the institution of the proceeding are sufficient. G.S. 48-2(3).

**5. Adoption § 2; Pleadings § 20—**

Where the petition in adoption proceedings against the father of the child fails to allege that the child's mother had consented in writing to the adoption, the defect in the petition is cured when the father's verified answer admits that the mother had filed a written consent to the adoption after the institution of the proceeding.

**6. Adoption § 3—**

An abandonment of a child so as to obviate the consent of the parent to the adoption of the child imports a wilful and intentional course of conduct of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child.

**7. Same—** **Evidence of abandonment of child by parent held sufficient to be submitted to the jury.**

Evidence in this case tending to show that the father of the child,

sought to be adopted by petitioner, failed to pay any expenses incident to the birth of the child, that the child was left in the custody of its maternal grandmother except for a short period of a few months when the parents made a home for the child, and that the grandmother paid the living expenses of the child and provided a home for the child, and, further, that the father showed no affection for or interest in the child and regarded the child solely as a means of obtaining money from the grandmother in exchange for his consent that she retain custody of the child, *is held* amply sufficient on the issue of the father's abandonment of the child.

**8. Same—**

Where the evidence tends to show a course of conduct on the part of the child's father evincing an intentional purpose to forego all parental duties and relinquish all parental claims to the child for a period of more than six months prior to the institution of adoption proceedings, the mere fact that on one occasion within six months of the institution of the proceedings the father visited for a period of several days the home of his mother-in-law, who had custody of the child, does not preclude a finding by the jury that the father had abandoned the child.

**9. Trial § 15—**

Where a deposition introduced in evidence is set out in narrative form in the record, an objection to the introduction of the deposition is a broadside objection to the deposition *en masse*, notwithstanding that the assignment of error is to "each and every question and each and every answer contained therein," and such objection cannot be sustained if any part of the evidence contained in the deposition is competent.

**10. Same;   Evidence § 21—**

Objection made to the introduction of a deposition in evidence immediately before the jury is empaneled is not made before trial within the purview of G.S. 8-81, and therefore the right to object to the competency of the deposition is waived.

**11. Trial § 15—**

Where objection to the admission of evidence is based upon a specified ground, the competency of the evidence will be determined solely on the basis of the ground specified, even though there may be another ground upon which the evidence might be held incompetent.

**12. Adoption § 3;   Evidence § 16.1—**

In proceedings for adoption based upon the abandonment of the child by its parent, evidence that after the institution of the proceedings the parent obtained possession of the child from petitioner by false pretense in violation of a restraining order theretofore issued in the cause, negotiated for the return of the child to the petitioner for a large sum of money, and revealed the whereabouts of the child only after being ordered to do so in a *habeas corpus* proceeding in another state, *is held* competent as disclosing conduct on the part of the parent indicating a consciousness on his part that his cause was a bad or weak one.

PRATT *v.* BISHOP.

**13. Adoption § 3—**

An instruction upon the issue of abandonment that in order for the jury to return an affirmative answer to the issue it must find that the abandonment was wilful and without just cause or excuse, etc., *is held* sufficient, and objection that the court failed to charge that the abandonment must have been accomplished purposefully and deliberately in violation of the law, is untenable.

APPEAL by respondent from *Crissman, J.,* January 23, 1961 Term of FORSYTH, docketed and argued as No. 390 at Fall Term, 1961.

Petitioner, Mrs. Geraldine Fleshman Pratt, the maternal grandmother of Gerri Leigh Bishop, instituted this proceeding on May 28, 1959, to adopt her for life. In her petition she alleged, *inter alia,* that Gerri was born on April 29, 1956, and on or about that date the child was placed with petitioner by her parents; that the child's mother, Ann Leigh Graham Bishop, has verbally consented to the adoption; that the mother is presently out of the State, but petitioner will take immediate steps to obtain her written consent and file it in the proceedings.

With reference to the father, the respondent, George W. Bishop, the allegation of the petition is as follows:

"15. That said child's father has abandoned said child, in that he has wilfully and negligently absented himself from said child, who, at all times since her birth, has been in the custody and control of petitioner at her home; that he has wilfully abandoned the care, custody, nurture and maintenance of said child to petitioner; that he has completely and consistently failed to provide for said child, even to the extent that petitioner was required to pay the medical fees and expenses connected with the birth of said child; and that he has never shown any interest in the said child's health and welfare, and that in these and other respects he has abandoned said child."

The petitioner prayed that the relation of parent and child be established between her and Gerri; that the child's father be made a party to the proceeding; that the court determine and adjudicate that said child had been abandoned by its father; and that the court set a date for the determination of the issue of abandonment.

Summons was issued for the respondent on May 28, 1959. Thereafter it was duly served, and respondent filed an answer in which he denied that he had abandoned the child. He further denied that petitioner was a proper person to adopt the child.

On May 29, 1959 the mother of the child signed a written consent to its adoption by petitioner. This consent was filed in the cause on June 2, 1959.

After the answer was filed the proceeding was transferred to the civil issue docket for the trial of the issue of abandonment raised by the pleadings as provided by G.S. 48-5(c).

On November 9, 1959, Honorable Walter E. Johnston, Jr., Resident Judge, 21st Judicial District, signed a restraining order in the proceeding enjoining respondent "from interfering in any manner with the present actual custody or control of a certain child, namely, Gerri Leigh Graham, the said child being the daughter of said George W. Bishop, or in any manner disturbing said child in the present custody or control of petitioner, or others acting in behalf of petitioner, or in any manner removing, or seeking to remove said child from the custody or control of petitioner, or from the State of North Carolina." On the 15th day of December 1959 respondent accepted service of this restraining order.

On a date undisclosed by the record, but prior to December 18, 1959, and presumably after the institution of this adoption proceeding, respondent instituted a *habeas corpus* proceeding to obtain the custody of Gerri or to secure visitorial rights. This proceeding is referred to in the record but is not set out. On December 18, 1959 the judge entered an order allowing respondent certain visitorial rights, but only upon condition that he be bound by the restraining order entered on November 9, 1959 in this adoption proceeding.

Thereafter on April 1, 1960, under circumstances which will be set out in more detail in the statement of the evidence, respondent abducted the child in violation of the restraining order and took her to the State of New York. As a result, on April 30, 1960, Judge Johnston revoked the order of December 18, 1959, enjoined respondent from interfering with or in any manner disturbing the custody and control of petitioner over Gerri, and committed the child to the exclusive custody of petitioner until the further orders of the court. This injunction is still in force.

When the case was called for trial on January 24, 1961, the respondent demurred to the petition. The demurrer was overruled. Both parties offered evidence.

The petitioner's evidence tended to show the following facts:

Petitioner and her mother, Mrs. Mina Pepper Fleshman, live together in the home of Mrs. Fleshman at 1087 Kent Road in Winston-Salem. They are ladies of considerable means. In 1954, immediately after being divorced from a former husband, Ann Leigh Graham, the daughter of petitioner, married George W. Bishop, the respondent. The petitioner and her mother opposed the marriage because respondent frequented race tracks and had no job. However, Mrs. Fleshman gave them the apartment over the garage on the side of her house

as a home when they were in Winston-Salem. Thereafter they used the apartment as a place to sleep when they were passing through Winston-Salem. Apparently, during the first year and a half of their marriage, the Bishops made the Middleburg Inn at Middleburg, Virginia, their headquarters because it was easily accessible to New York and strategically located near a number of horse and dog race tracks. Mrs. Bishop kept a room at the Inn, and respondent came from New York and elsewhere for the week-end. Respondent would arrive at the Inn under the influence of intoxicants and drink continuously while he was there. From the beginning of the marriage in 1954 through the events which ended in the Supreme Court of New York in April 1960, the evidence discloses that respondent continuously drank intoxicants to excess. One witness, who met him shortly after his marriage, had known him five or six years and during that time had seen him fifteen or twenty times and had never seen respondent sober.

Mrs. Bishop was very much in love with her husband, and he was in a good humor with her when he wanted money. He would frequently incur gambling debts, "get in a jam," and require from one to five thousand dollars from his wife. He normally bet about $2,000.00 a day when at a race track. When drinking his language was foul and profane. He appeared to enjoy embarrassing his wife in public by hurling vile and degrading epithets at her. He frequently and publicly accused his wife of infidelity while boasting in crude language of his own. He admitted that he had used his wife's money to pay for an abortion upon a girl in Florida. On numerous occasions he threatened his wife with bodily harm.

Respondent told the operator of the Middleburg Inn that he was going to break his wife if it were the last thing he did. She understood him to mean that "he was going to take all her money." He wanted a farm, and "wanted to fox hunt" like all the wealthy people did; so his wife bought a farm near Washington, D. C. He then refused to live there with her.

During the winter of 1955, before the child was born in Winston-Salem on April 29, 1956, Mr. and Mrs. Bishop stayed in the garage apartment at 1087 Kent Road.

The child, Gerri, was very small and delicate and remained in the hospital for ten days longer than the mother did. Respondent was not there when the child was brought from the hospital to petitioner's home. Four or five days after the birth of the child he had gone to a race track. After three weeks he came back, stayed one night and left again. In June of 1956, when petitioner and her mother went to their summer home at Kitty Hawk, Gerri and a nurse went with them.

The record does not disclose the continuous whereabouts of Mr. and Mrs. Bishop. However, in July 1956, when Gerri was less than two months old, they were guests of William M. Bellamy at his home on Long Island. At the beginning of the visit respondent absented himself for two days without explanation and without letting his wife know where he was. This visit was a prolonged drunk during which respondent abused his wife continuously, calling her indecent names in the presence of their host and beating her until she was bruised extensively. On one occasion he razed her skin with a lighted cigarette and burned her dog's ears. One evening he passed out just before a dinner party given in their honor.

Later in the month of July 1956 at a restaurant in Delaware respondent requested Joseph D. Wood, Jr., who had also been a Bellamy guest, to go to Kitty Hawk and take some pictures of Gerri so that he could identify her for some people he said he had lined up to take the child away from Mrs. Pratt's house there. He told Wood "that Mrs. Pratt and Mrs. Fleshman would never let anything happen to that child; that they were crazy about the child and that she was the only weapon that he had to see that he was taken care of." He talked about having lawyers in various states and introduced Wood to one named Buzz. He also asked Mr. Wood to size up the child's German nurse with the view to seeing whether she could be bribed to participate in the child's abduction. When Wood asked him if he was going to take the child to the house Mrs. Bishop had bought in Virginia, he said that he thought he would be traveling around pretty fast and wouldn't be there.

Gerri continued to live with petitioner and Mrs. Fleshman. In Winston-Salem she had her own upstairs room in the main house. During the first and second years of the child's life, respondent had almost no contact with her. In a year's time he would be in Winston-Salem only two or three days and then just when passing through from one race track to another. He would stay there a few days at Christmas. He never played with the child, picked her up, or showed any sign of affection prior to the institution of these adoption proceedings. Mrs. Fleshman frequently requested him to get a good job, quit the horse business, and make a home for his wife and child, but he never made any response to her. She offered to build a house for them, but this offer was not accepted. Mrs. Fleshman and Mrs. Pratt wanted the child to grow up in their home but were ready to give her up if the Bishops would establish a proper home for the little girl. From the time of the child's birth until the institution of the adoption proceedings he never said anything about wanting the child.

Respondent always wore expensive clothes and drove a Cadillac but Mrs. Fleshman paid the expense of the child's birth. Mrs. Pratt and Mrs. Fleshman have provided a home for her, paid for her food, clothing and maintenance since the date of her birth. Respondent has paid nothing. Petitioner and Mrs. Fleshman never made any request of the respondent for any expenses. On the contrary, Mrs. Fleshman lent the respondent money from time to time. He now owes her $9,000.00. The Bishops were always hard up when they came to her house. He never had any money at all, and Mrs. Bishop paid all the bills incident to his visits which Mrs. Fleshman did not pay.

On one occasion before the child was two years old, Mrs. Fleshman and her nurse took Gerri for a visit to Mr. and Mrs. Bishop at a house in Southern Pines which Mrs. Bishop had rented for three months Thereafter the Bishops left Southern Pines, and the child returned to 1087 Kent Road. That was the only time the child ever left 1087 Kent Road to be with her parents.

In the summer of 1957, the Bishops again visited Mr. Bellamy on Long Island. Again respondent was drunk during the entire visit. He constantly subjected his wife to embarrassment and humiliating abuse, making obscene charges of immoral acts and calling her filthy names. On one occasion he knocked her across the face several times until she fell upon the sofa. On another, he struck her to the floor where he kicked and abused her before walking out of the house. According to one of the witnesses to these scenes, "Mrs. Bishop remained calm and conciliatory and displayed a great affection for Mr. Bishop and appeared to be under his sway." Respondent told Mr. Bellamy that the child was his ace up his sleeve.

In 1958, on one occasion when Mrs. Bishop was at the Middleburg Inn, respondent came there with another man. Respondent was drinking and refused to share Mrs. Bishop's room. In the night respondent came to her room and assaulted her with knucks while she was asleep. In the dark she did not recognize her assailant. The proprietor of the Inn, her son, and the man who had accompanied him to the Inn finally restrained respondent who was knocking Mrs. Bishop down as fast as she could get up. After the assault the room was a shambles; the curtains, dresser scarf, bed and floor were bloody. Six or seven stitches were required to sew up Mrs. Bishop's head.

The operator of the Inn caused respondent to be arrested but, at Mrs. Bishop's request, she later dropped the charges. Mrs. Bishop represented to her that she and Mr. Bishop were "going back together and get our baby and try to raise it." After that he gave Mrs. Bishop another beating in New York. On one occasion about this time when his wife was away respondent occupied a bedroom at the Inn with another woman.

In December 1958, Mr. and Mrs. Bishop came to 1087 Kent Road two days before Christmas to spend the holidays there. Mrs. Bishop had a present for the child but Mr. Bishop did not. Prior to Christmas, 1959, when he gave her a doll after the adoption proceedings had been started, respondent had never given the child a present or sent her a card. On December 23, 1958, Mrs. Bishop and Mrs. Fleshman were in conversation at the dinner table. Respondent said to Mrs. Fleshman, his eighty-year old hostess, "Shut up old woman." When Mrs. Bishop told him he could not talk to her grandmother like that he got up from the table and "smacked her as hard as he could." They both got up, and he went into the hall beating his wife as hard as he could. Mrs. Fleshman attempted to protect her granddaughter with her cane.

On the day after Christmas Mrs. Bishop was committed by respondent to Pinebluff Sanatorium, apparently for acute alcoholism. Upon his return from this mission Mrs. Pratt asked respondent how much liquor he was accustomed to drinking and he replied "Well, I can drink as much as four or five 5ths every day." Thereafter he immediately left for the races in Florida and Mrs. Pratt did not see him again. He was not in Winston-Salem from December, 1958 until May, 1959 after the adoption proceedings were started.

In April or May 1959, just before the adoption proceedings were instituted, respondent and his wife became estranged because of "some deal he pulled in Florida." He attacked her in a most violent manner and broke her arm when she discovered some canceled checks he had written. Thereafter he started legal proceedings against her — "a divorce proceeding or what not" — in which he asked for custody of the child. This was the first time he had ever mentioned wanting the child, and petitioner found out about the action from the newspaper. He never demanded the child from the petitioner who had her.

Respondent, in addition to horse racing, was interested in dog racing. In May 1959, at a hunt club near Philadelphia in the presence of at least fifty people, he called his wife a degrading name and accused various people of having improper relations with her. At a dog show in Madison Square Garden where Mrs. Bishop was displaying some dogs which belonged to her respondent attempted to take the dogs. When the keeper, on instructions from Mrs. Bishop, refused to let him have them, he threatened the keeper with violence from the "syndicate." He told the keeper that his body would be found floating in the river or that he would get a bullet hole between the ribs.

After the adoption was started Mr. Bishop began to make inquiries about Gerri's welfare. Occasionally he would call petitioner on the phone from various race tracks along the east coast from New Hamp-

shire to Florida and from Ohio and West Virginia. On one occasion he telephoned petitioner and told her he might leave the family alone for $200,000.00.

On November 11, 1959, respondent had prepared a proposed agreement between petitioner, Mrs. Fleshman, and himself in which he agreed that they should have the custody of the child during their lifetimes in consideration of $90,000.00 in cash plus a guaranteed yearly income to him of $45,000.00 or one-half of the income from a certain trust, whichever was smaller, for a period of twenty years from January 1, 1960 or until the child's death, whichever occurred first. Respondent signed this agreement and tendered it to petitioner and Mrs. Fleshman who declined to sign it.

On April 1, 1960 respondent, after promising to return Gerri by 5:00 P. M. to Mrs. Fleshman, obtained permission to take the child to a park to ride the horses. Instead of returning her, he took her on an all-night ride to New York where he turned her over to two Negro servants or caretakers of a closed house on an estate in Long Island.

Petitioner offered in evidence the depositions of Walter L. Stratton, an attorney of New York City, and of Robert W. Kuhn, a detective. Respondent objected to the introduction of any part of each of these depositions on the ground that the entire deposition "is concerned solely with events that transpired several months after the institution of the action and are completely irrelevant to the issues raised by the petition and answer." The objection was overruled.

The Stratton deposition tends to show the following facts: Stratton, a New York attorney, was brought into the case on April 2nd after the child had been taken from the home of petitioner. On April 4th Stratton received a call from an attorney who said he was representing respondent. He arranged a meeting between counsel for petitioner and respondent in New York on May 5, 1960. At this conference respondent did not appear but Mr. Buzz Beler, attorney for Mr. Bishop, did. Beler stated to petitioner's attorneys that he did not know where the child was; that he had advised Mr. Bishop not to tell him, but both Bishop and the child would be available at the proper time. Beler said he had come "to talk money." Stratton then asked him what his proposition was for the return of Gerri to Mrs. Pratt's custody. His first proposition was $60,000.00. He then left the group for a telephone conversation with respondent; when he returned the demand was increased to $100,000.00. Counsel for petitioner told him that was hardly a good faith attempt to reach an agreement, and Mr. Beler again went to the phone. When he came back he stated that the final price for the return of Gerri was $150,000.00. Beler continually referred to Mrs. Pratt as "Money." He said that Mrs. Fleshman would not live

long; that she would not leave her money to Mrs. Bishop; that Gerri would inherit $20,000,000.00 and that respondent intended to get custody of Gerri while she was still a minor and that ought to be worth something to Mrs. Pratt and Mrs. Fleshman. This conference broke up about midnight with Beler promising to get in touch with the attorneys the next day.

On the next day counsel for petitioner obtained from a Judge of the Supreme Court of New York County a writ of *habeas corpus* for Gerri and an order of arrest for respondent. The following day the parties appeared before the Judge who ordered respondent to reveal the whereabouts of the child. As a result, he revealed that the child was on Long Island at the home of Mr. Henry Lewis who told the Judge that he had not known the child was there. Mrs. Pratt and Mrs. Fleshman found the child in the care of Negro servants in a cold house which had been closed for some time. She was in bed, sick with a cold, clothed only in underwear and socks. The servant said that the only clothes Gerri had were those she had on and the thin summer dress she was wearing when she arrived. The frightened child was hysterical with joy at the sight of Mrs. Pratt and Mrs. Fleshman.

Back in New York, later in the day, Beler told attorneys for petitioner that respondent had reduced the price for his consent to the adoption to $25,000.00. Next day, at the hearing on the writ of *habeas corpus*, respondent withdrew his opposition to the writ and consented that Gerri might be returned to North Carolina in the custody of Mrs. Pratt.

The deposition of Detective Kuhn tended to show that he made the acquaintance of the respondent on April 6, 1960 in a bar on 7th Avenue and talked to him for four and a half hours. Respondent told the detective he had brought his child up from the south; that his attorney had told him not to go near her as he would be followed; that the child was three or four years old and the worse thing he could have done was to have a child; that the child was his ace in the hole; that his mother-in-law wanted the child and his wife to whom he referred in very profane terms, did not; that he had the child to obtain money from his mother-in-law which he expected to be a large sum; that the child was more or less a pawn; that during the time the detective spent with him respondent took approximately thirteen drinks of scotch and became quite drunk.

Respondent offered evidence which tended to show that he was in the horse-racing business; that he married Mrs. Bishop in 1954; that he left the child at 1087 Kent Road in the custody of his mother-in-law and Mrs. Fleshman because it was the only practical thing to do; that he was running the horses in New York and Mrs. Bishop was

running the Middleburg, Virginia, operation; that "You can race in New York for about six months without moving and Maryland, about three months"; that "The actual winter" they spent in Southern Pines until the winter of 1958 when he went to Florida; that Mrs. Fleshman "has had complete custody of it (Gerri) since it was born"; that in 1958 Mrs. Bishop was committed to an institution for ninety days; that at that time he had a horse with a potential of $100,000.00 in Florida; that it cost $6,000.00 to run him in the handicap; that he made six visits to his wife while she was in the hospital and he saw the child on those trips, playing with her and taking her presents; that he and Mrs. Bishop discussed taking the child to Florida and starting a new life as soon as she got out of the Sanatorium; he hired a nurse in Florida although the child was never brought to Florida; that during Christmas 1958 he had constant contact with the child; that they had plenty of money and would have paid any bills for the child that they had been asked to pay; that he was never approached with the hospital bill for the child's birth; that he offered to pay the child's nurse in Winston-Salem but Mrs. Flesman refused to permit him to do so.

That when he took the child to New York there was a restraining order against his doing so; that he did this to draw things to a head and get a property settlement; that he took the child in a rented car with a chauffeur, another man and a woman he had met the day before and drove all night to New York; that he left her with colored servants in "a real nice rambling Long Island estate."

That in July 1959 he had written bad checks but he subsequently made them good; that the Maryland Racing Commission had suspended him as a trainer; that after April 1959 he sued for divorce in Forsyth County; that he also instituted a divorce action in Baltimore; that Mrs. Bishop instituted an action for divorce in Alabama, and that in a property settlement he got one half of the Southern Pines property or $20,000.00

Mrs. Bishop, testifying for the respondent, said that she had bought the farm in Virginia in 1958 so that they would have a permanent home where they could raise and train horses and respondent could commute to the Maryland tracks but that it did not work out that way; that they had offered to pay the bills for Gerri but were refused; that respondent had always wanted the child and showed Gerri great affection and much attention, but that she thought the child was better off with its grandmother than with them, because horse training is a seven-day business; that they had the child with them in Southern Pines from January, 1957 to April, 1957 when they went back to the track; that thereafter they made as frequent trips as possible to see

N.C.]          SPRING TERM, 1962.          497

her, both together and separately, and in January, 1958 they again took the child with them to Southern Pines for three months; that they spent each Christmas with the child in Winston-Salem until 1958 when she was committed to Pinebluff where she stayed for three months while respondent lived in Florida; that before her commitment they had discussed taking the child to Florida and Mrs. Fleshman had objected strenuously. She rejoined respondent in Florida after her release from Pinebluff.

Mrs. Bishop denied that respondent had attacked her at the Middleburg Inn but said that when he came to her room in the night she did not recognize him in the dark and she attacked him.

Mrs. Bishop admitted on cross-examination that she had gotten marks on her face from being slapped by respondent; that on one occasion he had broken her nose, but she denied that he had ever hit her with his fist. She admitted that in her divorce complaint she had alleged he broke her arm in Florida, split her head open in Virginia, and that he had never provided any support for her or the child. She did not know whether she was divorced from respondent or not. They were living together during Christmas, 1960. At the time of the trial Mrs. Bishop was 31 years old; Mr. Bishop, 34.

Respondent made timely motions for nonsuit which were overruled. This issue was submitted to the jury and answered as follows:

"Did George W. Bishop wilfully abandon the child, Gerri Leigh Bishop, for at least six consecutive months immediately prior to May 28, 1959?
"ANSWER: Yes."

The trial judge entered an order decreeing that the issue of abandonment had been determined against respondent and that Gerri was an abandoned child. He remanded the case to the clerk for further proceedings under the adoption law. The respondent appealed to this court assigning errors.

*Deal, Hutchins and Minor for petitioner appellee.*
*Eugene H. Phillips for respondent appellant.*

SHARP, J.   Respondent asked for a dismissal of this adoption proceeding or for a new trial on the basis of eighteen groupings of assignments of error. Only those which are properly presented will be expressly considered.

Assignments Nos. 3 and 5 through 8 relate to alleged errors in the admission or exclusion of evidence. We quote Assignment No. 7 which is typical:

"VII. The Court erred in refusing to permit Respondent to introduce evidence as to his plans and those of his wife about making a home for the child during the six months period immediately preceding the filing of this action, such evidence being material to the issue of his purported wilful abandonment of said child.

"As shown by Exceptions Nos. 36, 37, 38, 39, 44, and 45 (R. pp. 126, 127, 128 and 140)."

The following statement from *Nichols v. McFarland*, 249 N.C. 125, 105 S.E. 2d 294 is applicable here:

"Rule 19 (3), Rules of Practice in the Supreme Court, 221 N.C. 554, 555, as interpreted in the decisions of this Court, require: 'Always the very error relied upon shall be definitely and clearly presented, and the Court not compelled to go beyond the assignment itself to learn what the question is. (Citing cases) The objectionable assignments in their present form would require the Court to undertake a voyage of discovery through the record to ascertain what the assignments involve. This the Court will not do.'"

Assignments of error Nos. 9 through 16 relate to alleged errors of commission or omission in the charge. As this court said in *Darden v. Bone*, 254 N.C. 599, 601, 119 S.E. 2d 634:

"Assignments of Error 9, 10, 11, 12, 13, 14, 15 and 16 relate to the court's charge and are insufficient in that they do not present the error relied upon without the necessity of going beyond the assignment itself to learn what the question is and the particular portion of the charge to which the defendant objects is not specifically pointed out. 'The assignment must particularize and point out specifically wherein the court failed to charge the law arising on the evidence.' (Citing cases)

"It is clear that the Rules of the Court have not been complied with in the assignments of error as herein above enumerated. Rule 21 requires an appellant to state briefly and clearly his exceptions. Rule 19 (3) requires that the exceptions taken be grouped and the error complained of concisely but definitely set out as a part of the assignment. 'The Court will not consider assignments not based on specific exceptions and which do not comply with its rules.' *Travis v. Johnston*, 244 N.C. 713, 95 S.E. 2d 94. What the Court requires is that exceptions which are presented to the Court for decision shall be stated clearly and intelligibly

by the assignment of error, and not by referring to the record
and therewith there shall be set out so much of the evidence or
other matter of circumstance as shall be necessary to present
clearly the matter to be debated. In this way the scope of in-
quiry is narrowed to the identical points which the appellant
thinks are material and essential, and the Court is not sent scurry-
ing through the entire record to find the matters complained of."

Assignment of error No. 4 is to the failure of the court to permit each
paragraph of respondent's answer to be read to the jury. The assign-
ment of error itself does not disclose which paragraphs were not read
to the jury. However, it appears from an examination of the record
that only paragraph 15 of the petition was read to the jury. Paragraph
15 alleged that Gerri Bishop was an abandoned child and raised the
one issue in the case. Paragraph 15 of respondent's answer which de-
nied the alleged abandonment was read to the jury. His further answer
was likewise read except for certain portions which were clearly im-
proper pleadings and which would have been stricken upon motion.
No conceivable prejudice could have resulted to the respondent from
the ruling of the court of which he complains in purported assignment
of error No. 4.

The failure of the respondent to comply with the rules of practice
limits consideration to assignments of error Nos. 1, 2, 3, 17 and 19.
There is no assignment No. 18 in the record.

Respondent's assignment of error No. 1 is to the order of the judge
overruling his demurrer to the petition. The demurrer is in writing and
the only ground specified therein is "that no cause of action is stated
in accordance with the laws governing adoption." G.S. 1-128 declares
that a demurrer must distinctly specify the grounds of the objection
or it may be disregarded. A demurrer which merely charges that the
petition does not state a cause of action is broadside and will be
disregarded. *Duke v. Campbell*, 233 N.C. 262, 63 S.E. 2d 555. How-
ever, in his assignment of error and brief, respondent states that the
ground for the demurrer is that the petition contains no allegation
substantially in the words of General Statutes 48-2(3) that respondent
had wilfully abandoned the child for at least six consecutive months
immediately preceding the institution of the action. In paragraph 15
petitioner clearly intended to allege that respondent had abandoned
the child since birth. It would have been the better practice, and re-
quired fewer words, had petitioner alleged that Gerri Bishop was an
abandoned child within the definition of the statute. *Smith v. Crivello*,
338 Ill. App. 503, 88 N.E. 2d 107. Nevertheless, interpreting para-
graph 15 of the petition liberally as we are required to do upon a de-

murrer, it is apparent that petitioner has sufficiently alleged the ultimate jurisdictional fact that Gerri was an abandoned child at the time of the institution of the proceeding. *Long v. Love,* 230 N.C. 535, 53 S.E. 2d 661. Having alleged it, the burden then developed upon the petitioner to prove at the trial the abandonment in conformity with the statute, *i. e.,* that respondent had wilfully abandoned Gerri for at least six consecutive months immediately prior to the institution of the proceedings. This was the sole issue in the trial in the Superior Court. The adoption statute does not place the allegation with reference to abandonment in the same category as the divorce statute, G.S. 50-8, places the allegation of residence and knowledge of the grounds of divorce. The demurrer was properly overruled and assignment of error No. 1 is not sustained.

In this court the respondent demurred *ore tenus* to the complaint because it showed that the mother's written consent to the adoption had not been executed at the time the petition was filed. The petition alleged in paragraph 12 that the mother had orally consented to the adoption and that her written consent would be filed. The record shows that her written consent was filed five days later. G.S. 48-15(12) requires that the petition shall state "that there has been full compliance with the law in regard to consent to adoption." The respondent, in his answer to paragraph 12 of the petition which he verified on the 14th day of August, 1959, admitted that the mother had filed a written consent to the adoption. By this admission respondent supplied the omission in the petition and cured the defect. 71 C.J.S. Pleading, Section 590(b); *Johnson v. Finch,* 93 N.C. 205; *Shuford v. Phillips,* 235 N.C. 387, 70 S.E. 2d 193; *Cox v. Freight Lines,* 236 N.C. 72, 72 S.E. 2d 25. The demurrer *ore tenus* is overruled.

Assignment of error No. 2 is to the failure of the judge to nonsuit the proceeding "in that no evidence was before the court, that respondent wilfully abandoned said child for six consecutive months immediately preceding the filing of the action as required by law." The effect of assignment of error No. 17 which relates to the judge's charge, is to allege that the failure of the judge to direct a verdict in favor of the respondent on the same grounds as specified in the motion of nonsuit was error. These two assignments will be considered together.

G.S. 48-2 defines an abandoned child as "any child under the age of 18 years who has been wilfully abandoned at least six consecutive months immediately preceding the institution of an action or proceeding to declare the child to be an abandoned child."

This court in *Truelove v. Parker,* 191 N.C. 430, 438, 132 S.E. 295, discussed the abandonment which would remove the necessity for a parent's consent. In the *Truelove* case the mother of the child was

never made a party to the adoption proceeding. Her written consent was not secured and there was no judicial determination of abandonment. In that opinion we find the following:

> "In 1 C. J., 1387 (76) it is said: 'To constitute such an abandonment by a parent as will deprive him of the right to prevent the adoption of his child, and dispense with the necessity of his consent, there must be some conduct on his part which evinces a settled purpose to forego all parental duties. But merely permitting the child to remain for a time undisturbed in the care of others is not such an abandonment.' By the terms of the statute it is necessary that such abandonment be wilful,—that is, accomplished purposely and deliberately in violation of law."

To frame a precise definition of abandonment which would cover all cases would be difficult indeed. The most frequently approved definition is that abandonment imports any wilful or intentional conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. 35 A.L.R. 2d, Anno.: Adoption-Abandoned or Deserted Child, 662, 665, 668; 2 C.J.S., Adoption of Children, Section 21 (2). Wilful intent is an integral part of abandonment and this is a question of fact to be determined from the evidence. In *Winans v. Luppie,* 47 N.J. Eq. 302, 304, 20 A. 969, 970, the court said with reference to abandonment in adoption cases:

> "It fairly may, and in our judgment does, import any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. * * * Such a purpose, clearly manifested, certainly forms a more reasonable ground for permitting judicial discretion to decide whether another may assume these claims and duties, than does the signature of the parent, which a mere impulse may induce."

Abandonment has also been defined as wilful neglect and refusal to perform the natural and legal obligations of parental care and support. It has been held that if a parent withholds his presence, his love, his care, the opportunity to display filial affection, and wilfully neglects to lend support and maintenance, such parent relinquishes all parental claims and abandons the child. *In re Davison's Adoption,* 44 N.Y.S. 2d 763.

Certainly a continued wilful failure to perform the parental duty to support and maintain a child would be evidence that a parent had relinquished his claim to the child. However, a mere failure of the parent of a minor child in the custody of a third person to contribute

to its support does not in and of itself constitute abandonment. Explanations could be made which would be inconsistent with a wilful intent to abandon.

Abandonment requires a wilful intent to escape parental responsibility and conduct in effectuation of such intent. *In re Bair's Adoption,* 393 Pa. 296, 141 A. 2d 873. In *Bair's* case the Pennsylvania Court said this:

> "A parent's intent to abandon a child soon becomes evident, especially in the case of an infant, by reason of the inexorable circumstances attending its physical being. A child's natural needs for food, clothing and shelter demand that someone immediately assume the attendant responsibility which an abandoning parent has ignored; and, that responsibility endures constantly. It does not await the capricious decision of an uncertain parent, perhaps, years later. * * *
>
> "Abandonment is not an ambulatory thing the legal effects of which a delinquent parent may dissipate at will by the expression of a desire for the return of the discarded child."

Measured by the yardstick of any definition of abandonment to be found in the books, it is apparent that the petitioner in the instant case has offered sufficient evidence of respondent's abandonment of his child to require the issue to be submitted to the jury. The record is replete with testimony of a most damaging character. It tends to show that from the date of her birth respondent has been more interested in horses than in his child; more interested in gambling than in earning a livelihood which would enable him to fulfill his legal and natural obligations to his child; more interested in living a life of debauchery than in making a home for his child. Indeed he has shown a total lack of parental interest. To him she has been merely "an ace up his sleeve" or "a pawn." It is a permissible inference from the evidence that his present ambulatory interest in Gerri is merely "to retain title to her" so that she may be bartered for sufficient cash to enable him to continue to frequent the races and live a profligate life. He did not pay the expenses of her birth. The petitioner and maternal grandmother have given the child the only affection she has ever known according to this record. It was the petitioner who rescued the terrified child from strange and cold surroundings and brought her back to the only home she has ever known.

Respondent's contention that his visit in the home of the petitioner where he saw the child at Christmas 1958, within six months of the institution of the adoption proceedings, conclusively refutes any abandonment on his part within six months is untenable. Such a visit to the

child, if it could be called a visit to her under the circumstances shown by the evidence, would not be analagous to a marital visit within two years of the institution of a divorce action.

To constitute an abandonment within the meaning of the adoption statute it is not necessary that a parent absent himself continuously from the child for the specified six months, nor even that he cease to feel any concern for its interest. If his conduct over the six months period evinces a settled purpose and a wilful intent to forego all parental duties and obligations and to relinquish all parental claims to the child there has been an abandonment within the meaning of the statute. *Winans v. Luppie, supra.*

There was a superabundant excess of evidence to overrule the motion of nonsuit. Assignments of error Nos. 2 and 17 are overruled.

Assignment of error No. 3 is to the admission in evidence of the depositions of Detective Kuhn and Attorney Walter J. Stratton of New York City. The reason for the objection is stated as follows: "* * * the proffered testimony of each witness is concerned solely with events that transpired several months after the institution of the action and completely irrelevant to the issues raised by the petition and answer." For that reason respondent objected "to each and every question" and "each and every answer." The deposition is not set out in question and answer form anywhere in the record. It appears only in narrative form as a part of the admitted evidence.

Respondent's objection to the depositions, even though stated to be an objection to each and every question and answer, was a general, broadside objection and should have been overruled if any part of the evidence contained in the deposition was admissible. The court below did not rule upon the competency of the various questions and answers, and unless this had been done it is not given to us to make specific rulings thereon. The trial court merely overruled the broadside objection to the *en masse* contents of the deposition. *Grandy v. Walker,* 234 N.C. 734, 68 S.E. 2d 807.

No objection was made to the deposition on the grounds of notice or irregularity in the taking. It was stipulated that the two depositions were taken in compliance with statutory requirements and that they were passed upon by the clerk after notice and without objection by the respondent at that time. No objection was made to any question or answer at the time the deposition was taken. The record shows that the trial of this proceeding was begun on the afternoon of January 24, 1961. The first objection to these depositions appeared in a written motion dated January 24, 1961. The record states: "Before jury impaneled the following proceedings occurred: (Respondent objected to

the introduction of depositions of the following witnesses * * * Walter L. Stratton, Robert William Kuhn.)"

G.S. 8-81 provides, *inter alia,* that *"At any time before the trial,* * * * any party may make a motion to the judge or court to reject a deposition for * * * incompetency of the testimony, * * * The objecting party shall state his exceptions in writing."

The purpose of this section is to give the party in whose behalf a deposition has been taken notice of any objection to the deposition and of the grounds for same before the trial. Parties going to trial without such notice may be taken at a great disadvantage if this is not done. *Ivey v. Cotton Mills,* 143 N.C. 189, 55 S.E. 613; *Sugg v. Engine Co.,* 193 N.C. 814, 138 S.E. 169. It has been uniformly held that objection to the incompetency of testimony and motion to reject the evidence must be made in writing before trial unless the parties shall consent to a waiver of this provision. *Morgan v. Fraternal Assoc.,* 170 N.C. 75, 86 S.E. 975; *Hudson v. R. R.,* 176 N.C. 488, 97 S.E. 388; *Bixler v. Britton,* 192 N.C. 199, 134 S.E. 488; *Steel Co. v. Ford,* 173 N.C. 195, 91 S.E. 844; *Grandy v. Walker, supra.*

In *Carroll v. Hodges,* 98 N.C. 418, 4 S.E. 199, objection was made to the competency of the questions and answers in a deposition at the trial. Referring to the applicable statute, now G.S. 8-81, the court said: "Such a provision is expedient, convenient, and not at all unjust. Fair opportunity is afforded every litigant to make objection to the deposition in every aspect of it, not in the hurry of a trial or hearing but upon deliberation and scrutiny. Unless such objection is made in apt time the statute makes the deposition evidence." *Houston v. Sledge,* 98 N.C. 414, 4 S.E. 197.

The record does not state that respondent's motion was filed before the trial commenced or before the trial. It says, "before jury impaneled." When a trial commences is a difficult question, and the answer may vary according to the statute being construed and according to the circumstances in a particular case. "In general, it has been held that the trial begins when the jury are called into the box for examination as to their qualifications — when the work of impaneling the jury begins — and that the calling of a jury is a part of the trial." 53 Am. Jur., Trial, Section 4. Certainly the purpose of G.S. 8-81 would not be served by a holding that the trial did not begin until after the jury was empaneled. Once the case is reached on the calendar and the jury called into the box, "the hurry of a trial" has begun and the time for deliberation and scrutiny of a deposition has passed.

On this record appellant has not shown timely objection to the admission of this deposition as evidence.

Furthermore, the respondent's objection to the entire deposition was based on the specific ground that it related to matters occurring after the institution of the action. "A specific objection, if overruled, will be effective only to the extent of the grounds specified. It makes no difference that there was another ground which would be found valid unless there is no purpose at all for which the evidence would have been admissible." Stansbury, Evidence, Section 27.

The substance of the evidence contained in these depositions was that respondent, in wilful violation of a restraining order entered by the Superior Court of Forsyth County in this proceeding and after it had been pending for about six months, obtained possession of the child by false pretenses and positive misrepresentations; that thereafter he took her out of the jurisdiction to the State of New York where he left the child without adequate clothing in strange, cold surroundings with Negro servants while he, through counsel, negotiated for her return to petitioner — first for $60,000.00 then $100,000.00 and finally $150,000.00; that he revealed the whereabouts of the child only after being arrested and forced to do so in a *habeas corpus* hearing before a Judge of the Supreme Court of New York.

Kidnapping his child and negotiating for her ransom is hardly the conduct of a father who expected to retain his paternal rights in the trial of this proceeding. We think that respondent's conduct, as evidenced by these depositions, tended to show such a lack of confidence in the merits and justice of his cause as to amount to an implied admission that he was not entitled to prevail.

In discussing "Conduct as Evidencing a Weak Cause", Wigmore in his monumental work on Evidence, 3rd Edition, Sections 276 and 278, concluded that from the conduct of a party which indicates a consciousness on his part that his cause is a bad or weak one, the jury may infer the fact that it is bad or weak. "* * * such conduct in a party opponent even if treated as a plain assertion, is at any rate an admission and is therefore receivable as such in any case"; Vol. II, p. 95.

In support of this reasoning, *inter alia*, Wigmore quotes from the following authorities:

"1870, *Cockburn, C.J.*, in *Moriarty v. R. Co.*, L.R. 5 Q.B. 319: 'The conduct of a party to the cause may be of the highest importance in determining whether the cause of action in which he is plaintiff, or the ground of defence if he is defendant, is honest and just, — just as it is evidence against a prisoner that he has said one thing at one time and another at another, as showing that recourse to falsehoods leads fairly to an inference of guilt. Anything

from which such an inference can be drawn is cogent and important evidence with a view to the issue.' "

"1905, *Phillimore, J.,* in *R. v. Watt,* 20 Cox Cr. 852: 'The principle is in fact well established. * * * It is this, that the conduct in the litigation of a party to it, if it is such as to lead to the reasonable inference that he disbelieves in his own case, may be proved and used as evidence against him.' "

In Criminal actions it is universally conceded that the fact of an accused's flight and his related conduct, are admissible as evidence of consciousness of guilt and thus of guilt itself. Wigmore, Section 276. In civil actions, says Wigmore in Section 278, "It has always been understood — the inference, indeed, is one of the simplest of human experience — that a party's falsehood or other fraud in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all *similar conduct,* is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit." (Emphasis added)

As *similar conduct* Wigmore lists, *inter alia,* concealment of material objects. He cites also the conveyance of property during litigation as evidence of the transferror's consciousness that he ought to lose. Wigmore, Section 282. In *State v. Kincaid,* 142 N.C. 657, 55 S.E. 647, it was held competent to ask a defendant upon his trial for seduction if he had not transferred his property to avoid the result of the indictment. He admitted it, and the court said, "It would have been equally as competent to ask him if he had not fled from the charge."

In the instant case the respondent denied that he had abandoned the child during the period prescribed by the statute. Whether or not he had was the one issue in the case. In violation of a restraining order, and before the trial in which the issue of abandonment was to be judicially determined, the respondent fraudulently spirited the child out of the jurisdiction of the court and attempted to bargain with petitioner for her return. Instead of waiting for the jury to vindicate his parental right to his child, he offered to relinquish his claim and return the child for a sum of money. The jury might logically infer from such conduct that respondent lacked confidence in the merit of his cause. It certainly qualified for inclusion in Wigmore's list of *similar conduct.*

Assignment of error No. 3 must be overruled both on the merits and on procedural grounds.

Assignment of error No. 19 charges that the trial judge failed to instruct the jury "that to constitute an abandonment the same must be accomplished purposely and deliberately in violation of law." An examination of the charge reveals that the judge told the jury many times that in order to answer the issue "Yes" they must find the abandonment to have been wilful. He explained that "wilful means that the abandonment would be without just cause or excuse, unjustifiable and wrong; that the respondent had a purpose to do it without authority, careless of whether he had a right or not." This was sufficient. *State v. Hinson*, 209 N.C. 187, 183 S.E. 397. Assignment of error No. 19 is overruled.

Although the respondent's assignments of error did not properly present his objections to the charge we think it appropriate to say that we have carefully examined it. When considered as a whole, the charge discloses no error prejudicial to the respondent. It appears that the judge stated every contention in behalf of respondent's case which could be culled from the evidence. On the evidence the jury decided against him. In the trial below we find no error. The order of Judge Crissman judicially decreeing Gerri Leigh Bishop an abandoned child and remanding the cause to the special proceeding docket for further action by the clerk in accordance with provisions of the adoption law is

Affirmed.