An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-1088

Filed 7 January 2026

Stanly County, No. 23JT000100-830

IN THE MATTER OF: C.D.W.

Appeal by Respondent-Mother from order entered 20 September 2024 by Judge Phillip L. Cornett in Stanly County District Court. Heard in the Court of Appeals 10 June 2025.

> *Kimberly Connor Benton and Deputy Parent Defender Annick Lenoir-Peek, for Respondent-Appellant-Mother.*
>
> *No brief filed on behalf of the Guardian ad Litem.*
>
> *No brief filed on behalf of Petitioner-Appellee-Father.*

CARPENTER, Judge.

Respondent-Mother appeals from the trial court's 20 September 2024 order (the "Order") terminating her parental rights as to the minor child, C.D.W. ("Chloe").[1] On appeal, Respondent-Mother argues the trial court erred by concluding she willfully abandoned Chloe. After careful review, we affirm.

---

[1] A pseudonym is used to protect the identity of the minor child and for ease of reading. *See* N.C. R. App. P. 42(b).

## I. Factual & Procedural Background

On 18 September 2023, Petitioner-Father filed a petition to terminate Respondent-Mother's parental rights as to Chloe based on the ground of willful abandonment. On 10 January 2024, Respondent-Mother filed an answer, denying she willfully abandoned Chloe. On 11 July 2024, the trial court commenced the termination of parental rights ("TPR") hearing. The evidence presented at the hearing tended to show the following.

Respondent-Mother and Petitioner-Father are the biological parents of Chloe, born in 2013. In addition, Respondent-Mother and Petitioner-Father share an older son, who has reached the age of the majority and is not implicated by this appeal. Respondent-Mother and Petitioner-Father never married but resided together from 1997 until they separated in early 2015. Since the parties separated, Chloe has continuously resided with Petitioner-Father.

On 25 January 2015, Petitioner-Father sought and obtained emergency custody of Chloe following Respondent-Mother's incarceration for assaulting Petitioner-Father. Later, on 24 September 2015, the trial court granted Petitioner-Father legal and physical custody of Chloe (the "2015 Order"). The 2015 Order initially granted Respondent-Mother, who had been released from incarceration by this time, overnight weekend visits. The trial court later modified the 2015 Order to give Respondent-Mother supervised visitation with Chloe for three hours every other Saturday. The 2015 Order specified that Respondent-Mother's uncle was to supervise

visitation with Chloe and that the parties were to exchange custody of Chloe at the Albemarle Police Department.

Petitioner-Father and Respondent-Mother gave competing testimony concerning Respondent-Mother's visitation. According to Petitioner-Father, Respondent-Mother and her uncle attended two or three scheduled supervised visits. After these initial visits, however, Respondent-Mother's uncle stopped attending. Petitioner-Father testified that Respondent-Mother occasionally tried to exercise visitation by herself, and he would not allow Respondent-Mother to exercise unsupervised visitation in violation of the 2015 Order. Petitioner-Father further testified that, "after a few times of me going up there, [Respondent-Mother] just stopped showing up." According to Petitioner-Father, he stopped taking Chloe to the scheduled visits after Respondent-Mother did not show up for visitation at least twelve times. According to Respondent-Mother, however, Petitioner-Father stopped appearing for visitation around Christmas 2015, yet she continued to show up at the Albemarle Police Department for visitation without a court-approved supervisor.

In 2016, Respondent-Mother filed three *pro se* contempt motions alleging that Petitioner-Father violated the 2015 Order by refusing to allow her visitation with Chloe. In her first contempt filing, Respondent-Mother requested that she be granted unsupervised visitation. Respondent-Mother testified that Petitioner-Father agreed to resume Respondent-Mother's visitation in response to her motions. Visitation, however, did not resume and Respondent-Mother's contempt motions were ultimately

dismissed. In 2017, Respondent-Mother was charged with trespassing after entering Petitioner-Father's home without permission, seeking to visit Chloe (the "Trespassing Incident"). Apart from the Trespassing Incident, the record does not tend to show any attempts by Respondent-Mother to exercise visitation since 2016.

Petitioner-Father maintained the same phone number from the entry of the 2015 Order until he changed his number after his "phone was destroyed" sometime in 2020. Petitioner-Father testified that he did receive "some Facebook messengers" from Respondent-Mother pertaining to their older son, but Respondent-Mother did not message, call, text, or otherwise contact Petitioner-Father about Chloe after 2015, aside from the Trespassing Incident. Respondent-Mother testified that Petitioner-Father would not allow her to call and speak with Chloe or inquire about her well-being. Respondent-Mother further testified that Petitioner-Father blocked her from contacting him at his phone number and on Facebook on or about March 2017, and he changed his phone number without sharing it with Respondent-Mother. According to Petitioner-Father, he did not share his new phone number with Respondent-Mother because he had "no way of contacting her."

Petitioner-Father resided at the same address from the entry of the 2015 Order until early 2021, when Petitioner-Father and Chloe moved to a new home. Petitioner-Father testified that he continued to receive mail at his old address, and he did not inform Respondent-Mother of his new address. Respondent-Mother testified that she could not locate Petitioner-Father because she did not know his new address or phone

number. Respondent-Mother further testified that she unsuccessfully attempted to locate Petitioner-Father by contacting the Department of Social Services and Petitioner-Father's friends and relatives.

On 24 October 2022, Respondent-Mother filed a motion for contempt and motion to modify, alleging, in relevant part, that Petitioner-Father: (1) continuously denied Respondent-Mother's court-ordered visitation with Chloe, (2) changed his phone number resulting in Respondent-Mother having no way to contact Petitioner-Father to schedule visitation with Chloe, and (3) threatened that Respondent-Mother would never see Chloe again if Respondent-Mother filed a motion for contempt. Respondent-Mother struggled to serve Petitioner-Father with her motion for contempt because she could not locate him. Ultimately, Respondent-Mother served Petitioner-Father by sheriff in August 2023, nearly a year after Respondent-Mother filed her motion.

On 18 September 2023, shortly after being served with Respondent-Mother's motion, Petitioner-Father filed a private TPR petition under a new file number alleging that Respondent-Mother willfully abandoned Chloe. The trial court stayed Respondent-Mother's motion pending resolution of Petitioner-Father's TPR petition.

At the end of the adjudication phase of the TPR hearing, the trial court concluded Respondent-Mother willfully abandoned Chloe during the six months immediately preceding the filing of the TPR petition. Following the disposition phase, the trial court concluded the termination of Respondent-Mother's parental

rights was in Chloe's best interests. In the Order, the trial court found that based on Respondent-Mother's "testimony, actions, and demeanor in [c]ourt, [she] holds a clear distain for the directives of the . . . 2015 Order and the [j]udge that issued that [o]rder and based in part of her own admission still holds no regard for the 2015 Order." The trial court also found the majority of Respondent-Mother's testimony was not credible. On 20 September 2024, the trial court entered the Order terminating Respondent-Mother's parental rights as to Chloe. On 26 September 2024, Respondent-Mother timely filed written notice of appeal.

## II. Jurisdiction

This Court has jurisdiction under N.C. Gen. Stat. §§ 7A-27(b)(2) and 7B-1001(a)(7) (2023).

## III. Issue

The issue is whether the trial court erred by terminating Respondent-Mother's parental rights based on willful abandonment.

## IV. Analysis

Respondent-Mother argues the trial court erred by terminating her parental rights as to Chloe. Specifically, Respondent-Mother challenges certain findings of fact as being unsupported by the evidence and argues the trial court's findings of fact do not support its conclusion that Respondent-Mother willfully abandoned Chloe. We disagree.

"Our Juvenile Code provides for a two-step process for termination of parental

rights proceedings consisting of an adjudicatory stage and a dispositional stage." *In re Z.A.M.*, 374 N.C. 88, 94, 839 S.E.2d 792, 796 (2020); *see* N.C. Gen. Stat. §§ 7B-1109(e), 1110(a) (2023). "[A]n adjudication of any single ground in [N.C. Gen. Stat.] § 7B-1111(a) is sufficient to support a termination of parental rights." *In re E.H.P.*, 372 N.C. 388, 395, 831 S.E.2d 49, 53 (2019).

"We review a trial court's adjudication that a ground exists to terminate parental rights under [N.C. Gen. Stat.] § 7B-1111 to determine whether the findings are supported by clear, cogent, and convincing evidence and the findings support the conclusions of law." *In re A.M.*, 377 N.C. 220, 225, 856 S.E.2d 801, 806 (2021) (citations and quotation marks omitted). "Clear, cogent, and convincing evidence is evidence which should fully convince." *In re S.D.*, 243 N.C. App. 65, 67, 776 S.E.2d 862, 863 (2015) (citation and internal quotation marks omitted). Unchallenged findings of fact are deemed supported by the evidence and are binding on appeal. *In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58 (2019) (citations omitted). "[A]n important aspect of the trial court's role as finder of fact is assessing the demeanor and credibility of witnesses, often in light of *inconsistencies or contradictory evidence*. It is in part because the trial court is uniquely situated to make this credibility determination that appellate courts may not reweigh the underlying evidence presented at trial." *In re J.A.M.*, 372 N.C. 1, 11, 822 S.E.2d 693, 700 (2019); *see In re I.K.*, 377 N.C. 417, 426, 858 S.E.2d 607, 613 (2021).

"[W]hether a trial court's adjudicatory findings of fact support its conclusion of

law that grounds existed to terminate parental rights . . . is reviewed de novo by the appellate court." *In re M.R.F.*, 378 N.C. 638, 641, 862 S.E.2d 758, 761–62 (2021) (citation omitted). "Under a *de novo* review, [this Court] considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *In re T.M.L.*, 377 N.C. 369, 375, 856 S.E.2d 785, 790 (2021) (quoting *In re C.V.D.C.*, 374 N.C. 525, 530, 843 S.E.2d 202, 205 (2020) (alteration in original)).

## A. Findings of Fact

Respondent-Mother challenges findings of fact 8, 9, 10, and 11:

> 8. . . . [D]uring the relevant period, 6-consecutive months prior to the filing of the Petition:
>
>> a. Respondent has not sent any, gifts, cards, presents, or letters to the minor child even though Petitioner gets mail at [his] address and Respondent is familiar with that address and has the means and ability to do so.
>> . . .
>> c. No supervised visits have been arranged by Respondent pursuant to the 2015 Order during this time period.
>> . . .
>> e. There is a child support order in place for Respondent to pay $55.00 per month to support the minor child and compliance with this order has been sporadic.
>> . . .
>
> 9. The Petitioner borne the primary responsibility of caring for the minor child from the date of birth until September of 2015, and since September 2015 has borne the sole responsibility of caring for said minor child.
>
> 10. During the relevant time-period, Respondent has not sent letters or gifts, visited with, or made contact by

Facebook Messenger or otherwise, to check on her welfare of the minor child, even though she has the means and ability.

11. Respondent's intent to willfully abandon the minor child is also demonstrated by the findings preceding the relevant 6-month time period:

. . .

b. Even though now Respondent argues that she had no way to comply with the 2015 Order because of a lack of participation by the supervision party in around the 2015-2017 time frame, she did not file for a motion to modify the 2015 order until 2022 and in, the 2022 motion, like the 2017 filings, she simply blames the Petitioner for not allowing her to visit with the minor child and requests that he be held in contempt of court for not doing so. Also, the 2022 motion shows that Respondent could have filed for modification of custody any time before 2022 and did not.

c. Respondent's lack of care and concern for the minor child, including gifts, cards, birthday presents, or Christmas presents sent to Petitioner's addresses or no phone calls or Facebook Messenger contacts to check on minor child's welfare or set up a supervised visit, only further demonstrates that Respondent's efforts described above were not genuine, pointing more to the reality of an intent to willfully abandon the minor child.

Respondent-Mother argues these findings are unsupported by the evidence because they fail to consider that she "did not have [Petitioner-Father's] current address since he moved in 2021 and changed his phone number in 2020," and she did not know Petitioner-Father "continued to receive mail at his prior address." She also contends the "mere fact [she] did not file a motion to modify her visitation sooner does not

establish that she willfully abandoned Chloe."

Even though Respondent-Mother argues these findings are unsupported by the evidence, she does not contend there is insufficient evidence to support the findings. Rather, she contends the findings fail to consider her testimony before the trial court. Respondent-Mother's arguments lack merit because the trial court, after hearing Respondent-Mother's testimony, determined her testimony that she did not know Petitioner-Father's current address or phone number was not credible. *See In re R.H.*, 295 N.C. App. 494, 501, 906 S.E.2d 829, 834 (2024) (Explaining that in TPR proceedings, "the proper inquiry is often fact-dependent and the trial court . . . is in the best position to determine the credibility of the witnesses before it and make findings of fact. Thus, the trial court determines the weight to be given the testimony and the reasonable inferences to be drawn therefrom"); *In re T.N.H.*, 372 N.C. at 407, 831 S.E.2d at 58. In addition, Respondent-Mother's argument regarding her failure to file for visitation goes to whether the findings support the trial court's conclusion on willful abandonment—not whether findings 8, 9, 10, and 11 are supported by the evidence.

Nonetheless, clear, cogent, and convincing evidence supports the challenged findings of fact. Petitioner-Father and his wife testified that he still receives mail at his previous address, where he lived and received mail from 2015 to 2021. In addition, Petitioner-Father said he has not received any mail at this address from Respondent-Mother. Petitioner-Father also said Respondent-Mother has never sent

Chloe any cards or gifts. Respondent-Mother concedes she never did so, instead arguing she did not know how to do so. But unchallenged finding 7(f) establishes that Respondent-Mother had knowledge of this address because of the Trespassing Incident. *See In re T.N.H.*, 372 N.C. at 407, 831 S.E.2d at 58.

Petitioner-Father testified that he has "gotten some Facebook messengers . . . from [Respondent-Mother] but nothing pertaining to [Chloe]." According to Petitioner-Father, Respondent-Mother only contacted him about the older son he shared with Respondent-Mother—"never [ ] about [Chloe]." Moreover, Petitioner-Father testified that he had not received any calls or text messages from Respondent-Mother regarding Chloe. Respondent-Mother testified that she did not know Petitioner-Father's phone number, but the trial court found Respondent-Mother's testimony was not credible. Petitioner-Father also testified that Respondent-Mother had not arranged supervised visits pursuant to the 2015 Order since approximately September 2015. Finally, Respondent-Mother testified that she occasionally did not make her child support payments due to unemployment.

Taken at face value, Respondent-Mother's testimony concerning her difficulties locating or contacting Petitioner-Father appears to raise genuine questions about whether Respondent-Mother manifested "a willful determination to forego all parental duties and relinquish all parental claims to the child." *See In re Young*, 346 N.C. 244, 251, 485 S.E.2d 612, 617 (1997). Nonetheless, it is not our role to reweigh the evidence, particularly where the trial court assessed witness

credibility and explicitly entered an adverse credibility finding as to Respondent-Mother. *See In re I.K.*, 377 N.C. at 426, 858 S.E.2d at 613 ("Because the trial court is uniquely situated to make this credibility determination appellate courts may not reweigh the underlying evidence presented at trial."); *In re J.A.M.*, 372 N.C. at 11, 822 S.E.2d at 700.

Accordingly, there is clear, cogent, and convincing evidence to support the challenged findings of fact. *See In re S.D.*, 243 N.C. App. at 67, 776 S.E.2d at 863.

**B. Willful Abandonment**

Respondent-Mother next argues the trial court's findings of fact do not support its conclusion that Respondent-Mother willfully abandoned Chloe.

"Abandonment implies conduct on the part of the parent which manifests a willful determination to forego all parental duties and relinquish all parental claims to the child." *In re Young*, 346 N.C. at 251, 485 S.E.2d at 617. "It has been held that if a parent withholds his presence, his love, his care, the opportunity to display filial affection, and wil[l]fully neglects to lend support and maintenance, such parent relinquishes all parental claims and abandons the child." *Pratt v. Bishop*, 257 N.C. 486, 501, 126 S.E.2d 597, 608 (1962).

The trial court's findings demonstrate Respondent-Mother has not attempted to schedule any visits with Chloe in compliance with the 2015 Order since 2015, and has not seen Chloe since the Trespassing Incident. In addition, Respondent-Mother has not mailed Chloe any letters, cards, or presents to either Petitioner-Father's

current home or previous home, where he continues to receive mail. Respondent-Mother also failed to contact Petitioner-Father by phone. Respondent-Mother did contact Petitioner-Father through Facebook Messenger, but her messages only concerned her older son—she never asked about Chloe and never asked for Petitioner-Father's current address or phone number. The trial court did not find credible Respondent-Mother's testimony that she attempted to send Chloe cards and gifts, contact Petitioner-Father and Chloe, and schedule visits with Chloe in compliance with the 2015 Order. *See In re R.H.*, 295 N.C. App. at 501, 906 S.E.2d at 834.

Because the trial court's findings demonstrate Respondent-Mother made no attempts to visit or contact Chloe, or even contact Petitioner-Father about Chloe, within the relevant period, the findings demonstrate Respondent-Mother withheld her "presence, [her] love, [her] care, the opportunity to display filial affection, and wil[l]fully neglect[ed] to lend support and maintenance . . . ." *See Pratt*, 257 N.C. at 501, 126 S.E.2d at 608. Accordingly, the trial court did not err by concluding Respondent-Mother "relinquishe[ed] all parental claims" and willfully abandoned Chloe. *See id.* at 501, 126 S.E.2d at 608.

We, however, note our concern that current Chapter 7B statutes and local rules authorize our trial courts to elevate one parent's private TPR petition over another parent's pending modification and contempt motions pertaining to previously-entered custody orders. By doing so, our trial courts may permit the TPR petition to subvert the other parents' Chapter 50 motions, thus changing the character of the civil

custody proceeding by relying on Chapter 7B statutes or local rules, which are intended to expedite actions where DSS is a party because the juvenile(s) reside in temporary placements.

A private TPR action fundamentally differs from a TPR case initiated by a county or state agency under Chapter 7B, where our laws exist to ensure expediency both for the protection of fundamental parental rights and permanence for the juvenile(s) involved. A trial court's willingness to stay one parent's pending motions in a civil custody action and first consider another parent's private TPR petition in a separate case number could result in an unfair, strategic advantage without resolving a salient issue that is foundational to the trial court's ultimate determination. By permitting the filing of a private TPR petition to automatically and fundamentally change the character of a custody action, the trial court opens the door to an element of gamesmanship in contentious custody matters.

## V. Conclusion

The challenged findings are supported by clear, cogent, and convincing evidence. In addition, the findings support the trial court's conclusion on willful abandonment. Accordingly, we affirm.

AFFIRMED.

Chief Judge DILLON and Judge MURRY concur.

Report per Rule 30(e).