**In re Farmer**

---

IN THE MATTER OF THE MINOR CHILDREN, JENNIFER LYNN FARMER
AND LAURA ANN FARMER

No. 806DC1079

(Filed 19 May 1981)

**Appeal and Error § 39.1— appeal dismissed for failure to docket in time**

Appeal is dismissed where the record on appeal was filed in the appellate court more than 150 days after the notice of appeal was given in violation of Appellate Rule 12(a).

Judge MARTIN (Harry C.) dissenting.

APPEAL by respondent from *Williford, Judge.* Judgment entered 21 May 1980 in District Court, HERTFORD County. Heard in the Court of Appeals 5 May 1981.

*Cherry, Cherry and Flythe, by Larry S. Overton, for the petitioner appellees.*

*Attorney General Edmisten, by Assistant Attorney General Henry T. Rosser and Associate Attorney Blackwell M. Brogden, Jr., as amicus curiae.*

*Carter W. Jones for respondent appellant.*

HEDRICK, Judge.

The judgment from which this appeal was taken was entered 21 May 1980. Notice of appeal was given on 23 May 1980. The record on appeal was filed in this Court on 11 November 1980 which was more than 150 days after the notice of appeal was given in violation of Appellate Rule 12(a). The time within which to file the record on appeal has not been extended by this Court. The appeal will be

Dismissed.

Judge WELLS concurs.

Judge MARTIN (Harry C.) dissents.

Judge MARTIN (Harry C.) dissenting.

Although it is certainly true that respondent failed to file the record on appeal within 150 days as required by Rule 12(a) of the North Carolina Rules of Appellate Procedure, I most respectfully dissent from the decision of the majority to dismiss the appeal. I vote to exercise our discretion under App. R. 2 and treat the appeal as a petition for certiorari, allow the petition, and pass upon the merits of the appeal.

Respondent argues that the evidence is insufficient to support a conclusion that he has forfeited his parental rights pursuant to N.C.G.S. 7A-289.32(5). I agree with respondent.

The statute reads:

The court may terminate the parental rights upon a finding of one or more of the following:

. . . .

(5) One parent has been awarded custody of the child by judicial decree, or has custody by agreement of the parents, and the other parent whose parental rights are sought to be terminated has for a period of one year or more next preceding the filing of the petition willfully failed without justification to pay for the care, support, and education of the child, as required by said decree or custody agreement.

N.C. Gen. Stat. 7A-289.32, 1979 Supp.

The following evidence in the record supports respondent's contentions: The two female children involved were born 21 February 1971 and 24 November 1975, respectively. The parties separated in February 1976 and agreed that the mother would have custody of the children and respondent father could visit them at reasonable times. Respondent agreed to pay $75 a week for the support of the children. No written separation agreement appears in the record on appeal, nor is there any testimony that the agreement was in writing. The parties did testify that there was an understanding as to support payments and visitation privileges. Thus it appears that this agreement was not a formal written contract, but a verbal understanding of the parties when they separated.

On 11 March 1977, the parties were divorced and on the same day the mother married petitioner Charles Whitaker. The children have remained with the petitioners since their marriage. At the time of the separation, respondent was working with John Cross and Company of Charlotte and earning substantial wages. Within five or six months he left that employment as it required him to move from Aulander to Winston-Salem. He went to work with Bob Francis, earning about $140 take-home pay a week.

Petitioner Linda Whitaker testified:

> After we separated he made the seventy-five dollar a week payments. I think he probably made two full seventy-five dollar payments. . . . He said he wasn't making the payments because he didn't have the money. In fact, he said that I was probably making more than he was. He was still working then. I didn't talk with him very many times about the child support payments. . . .
>
> .  .  .  .
>
> Q: Has Osie's sister ever been to your house to pick up the children?
>
> .  .  .  .
>
> A: Unh-hunh (yes), she has.
>
> .  .  .  .
>
> Q: And when she came to pick 'em up would you tell her to make sure that they didn't see Osie?
>
> A: No, I wouldn't say exactly make sure.

Respondent testified:

> I did not buy any furniture for the trailer. Linda, my ex-wife bought some and put it in the trailer. I made payments of Four Hundred and Fifty-Dollars on the furniture. I paid it off after she left. . . . I saw the children after I separated. Sometimes I would see them every weekend. Some weekends I had to work on Saturdays, and I wouldn't get down on Saturday, it would be late Sunday evening when I got home and they'd be gone. I [saw] them three weeks out of the month on an average. I would see them at my mother's

YALE LAW LIBRARY

house. The children would stay with their grandparents and not their mother, nearly every weekend. Laura Ann would go to Church with my father on Sundays.

. . . I paid for the first year, not seventy-five dollars every week, but she did receive money from me every week. Some weeks it would have been twenty dollars, and sometimes as low as ten. I would give her what I could. . . . When Linda and I got divorced, we discussed child support at that time. I asked her how much child support was set. She said there wasn't anything set in Court. She said, "I told them that you had looked out for them, you knew they were yours and you would if you could." I have carried the children on trips. I've carried them to Tuscarora Beach swimming. We have carried them to the Town House in Windsor to eat supper. We have carried them to the Horseshow in Windsor. We have carried them to my house and cooked in the yard. We asked to carry them to King's Dominion, but she refused to let them go. That was last year. I have bought the children Christmas presents every Christmas. The first year, I give Linda a hundred and twenty-five dollars about 1:00 that afternoon they were going to do last minute shopping. . . . I bought presents for the kids this past Christmas. I spent over two hundred dollars on them. . . .

Defendant's Exhibit No. 1 is a picture of Laura Ann and I in my trailer. . . .

. . . .

One Friday afternoon, I went down to pay her, but she wasn't home. I paid the money to my mother. I gave her seventy-five dollars to give to Linda. I went back on Saturday to see the kids. When I approached the door, she told me I wasn't coming in. I asked her to move away from the door. I told her I had paid the money and I wanted to see my kids. She wouldn't let me—I hadn't seen them in two weeks then. I told her to move away from the door and I broke the glass and went in to see the kids. She fussed and raised cane, but I still saw them. . . .

. . . .

Q: Do you love the children, Osie?

A: Yes, sir, I do.

. . . .

I was working at Harrington Manufacturing Company, and I got laid off because the carpenter work just give (sic) out over there and they closed the plant. I am now working with George Bell running a bulldozer. I make Five Dollars an hour.

Q: Since you and your wife separated in January of 1976, have you remained steadily employed?

A: No, sir.

Q: Did you have trouble finding work during that period of time?

A: Yes, sir.

Sometimes I work fifty hours and week, it just depends on if it rains, or if we have anything to do. If it is raining we can't work. I do not get paid if it is raining. . . .

. . . .

. . . I was paying her seventy-five dollars a week, like some weeks down as much as thirty dollars a week, thirty-five. I've give her—I've had say fifty dollars in my pocket and I'd give her thirty-five of it.

Q: Did you give her something every week?

A: Yes, sir.

. . . .

. . . I would pay the money in cash. I would give her some months ten dollars. Some months I would give her more than others. I gave them maybe ten dollars one week, five dollars one week and maybe twenty dollars sometimes when I saw them. I did not see the children every week. I would say I would see them about three weeks out of the month, in 1979. I would see the children at my mother's mostly on Sundays. My mother, father, sister, brothers and their kids would be there too. I don't remember the exact dates when I would take them on trips to the beach and out for dinner. It has been four years since we separated. I took them to the

beach in 1977. I took them to Tuscarora Beach with my wife. I have carried them to the Beach twice. I have taken them to dinner two or three times. I have taken them to the horse-show once. For four years I have carried them to the beach twice, out to dinner about four times, and to the horseshow once. I have also carried them to my house to cook out in the yard four or five times. I have been able to visit my children at my mother's about three times a month. I could not afford to get an attorney about visitation rights for myself, so I wouldn't have to see the children at my mother's.

The termination of parental rights is a drastic remedy and should not be entered into lightly, but only after careful, reasoned and mature reflection. Although there is no present case law interpreting N.C.G.S. 7A-289.32(5), it would seem that the standard should be no less than that required for a finding of abandonment under the prior language of N.C.G.S. 48-5 and 48-2(3a). The Supreme Court stated that rule to be:

> To constitute an abandonment within the meaning of the adoption statute it is not necessary that a parent absent himself continuously from the child for the specified six months, nor even that he cease to feel any concern for its interest. If his conduct over the six months period evinces a settled purpose and a wilful intent to forego all parental duties and obligations and to relinquish all parental claims to the child there has been an abandonment within the meaning of the statute.

*Pratt v. Bishop*, 257 N.C. 486, 503, 126 S.E. 2d 597, 609 (1962). *Accord, In re Stroud*, 38 N.C. App. 373, 247 S.E. 2d 792 (1978).

There is no evidence that petitioners made any effort to require respondent to pay according to their version of the agreement. Respondent was living in the area the entire time and available for the service of process, as well as informal demands for payment. This lack of evidence supports an inference that petitioners did not want any payments from respondent, and were in reality building a case against respondent. This is further buttressed by respondent's evidence that he offered payments to petitioners and they refused the money.

The statute requires that the failure to pay must be willful and without justification. In interpreting the willfulness require-

ment as applied to abandonment, this Court stated: "The word 'willful' means something more than an intention to do a thing. It implies doing the act *purposely* and *deliberately*." *In re Maynor*, 38 N.C. App. 724, 726, 248 S.E. 2d 875, 877 (1978) (emphasis in original). Respondent's mere failure to pay as agreed does not meet this standard.

A question also arises whether the agreement described by the parties in their testimony is a "custody agreement" within the meaning of the statute. It certainly does not qualify as a separation agreement pursuant to N.C.G.S. 52-10.1. This statute requires separation agreements to be in writing and acknowledged by both parties before an officer so authorized by N.C.G.S. 52-10(b). The termination of parental rights statute is contrary to the common law and must be strictly construed. *Ellington v. Bradford*, 242 N.C. 159, 86 S.E. 2d 925 (1955). A reasonable interpretation is that N.C.G.S. 7A-289.32(5) requires that there be a formal custody agreement, executed in accordance with N.C.G.S. 52-10.1. It is illogical that the legislature would require the custody agreement to be embodied either in a judicial decree, or alternatively, in the form of an informal, oral agreement. This conclusion is further supported by the rule of law that agreements dealing with custody and support are not binding on the court, as the court has both inherent and statutory authority to protect the interests of and to provide for the welfare of children. *Perry v. Perry*, 33 N.C. App. 139, 234 S.E. 2d 449, *disc. rev. denied*, 292 N.C. 730 (1977); *McKaughn v. McKaughn*, 29 N.C. App. 702, 225 S.E. 2d 616 (1976). An order setting child support may be modified by the court under N.C.G.S. 50-13.7, 1979 Supplement. The law should require a definite written statement of the support duties of a parent to sustain a termination of parental rights based upon the breach of such agreement. I would hold that the informal, oral agreement testified to by the parties is not a custody agreement within the meaning of N.C.G.S. 7A-289.32(5).

I cannot conclude as a matter of law that petitioners have by clear, cogent and convincing evidence, as required by N.C.G.S. 7A-289.30(e), supported the conclusion that respondent has for a period of one year willfully failed without justification to pay for the care, support, and education of his children, as required by a custody agreement within the meaning of the act. Nor have they

shown by such evidence that the best interests of the children would be served by terminating their natural father's parental rights. *See* N.C. Gen. Stat. 7A-289.22(3).

One of the legislative purposes of the statute is "to protect all children from the unnecessary severance of a relationship with biological or legal parents." N.C. Gen. Stat. 7A-289.22(2). The result in this case violates that stated purpose.

I vote to reverse and remand the proceeding for dismissal.