IN THE SUPREME COURT OF NORTH CAROLINA

No. 461A19

Filed 20 November 2020

IN THE MATTER OF: K.C.T.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 23 August 2019 by Judge William F. Brooks in District Court, Wilkes County. This matter was calendared for argument in the Supreme Court on 7 October 2020 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Vannoy, Colvard, Triplett & Vannoy, P.L.L.C., by Daniel S. Johnson, for petitioner-appellees.*

*No brief for appellee Guardian ad Litem.*

*Anné C. Wright for respondent-appellant.*

EARLS, Justice.

Respondent-mother appeals the trial court's order terminating her parental rights to her minor child K.C.T.[1] After careful review, we reverse in part and reverse and remand in part.

On 9 October 2015, the Wilkes County Department of Social Services (DSS) placed Kelly in a voluntary kinship placement with petitioners, who are her paternal

---

[1] The minor child K.C.T. is referred to by the pseudonym "Kelly" throughout this opinion in order to protect her identity and for ease of reading.

aunt and uncle. DSS became involved with the family after respondent-mother reported that Kelly's father was manufacturing methamphetamine in their home. The father was arrested and charged with multiple felony drug offenses as well as misdemeanor child abuse. Respondent-mother was not charged with any crimes.

On 8 January 2016, petitioners filed a civil custody action. On 18 April 2016, they were awarded sole legal and physical custody of Kelly. The custody order denied respondent-mother any visitation with Kelly "until she petition[ed] the Court to modify the Order."

On 12 March 2019, petitioners filed a petition seeking to terminate the parental rights of both of Kelly's parents on the grounds of neglect, willfully leaving Kelly in a placement outside the home for more than twelve months without making reasonable progress toward correcting the conditions that led to her removal, dependency, and willful abandonment. *See* N.C.G.S. § 7B-1111(a)(1)–(2), (6)–(7) (2019). Kelly's father then relinquished his parental rights. On 27 June 2019, the trial court appointed a guardian *ad litem* to represent respondent-mother's interests under Rule 17 of the North Carolina Rules of Civil Procedure. *See* N.C.G.S. § 1A-1, Rule 17 (2019).

The matter was heard on 13 August 2019. Ten days later, the trial court entered an order terminating respondent-mother's parental rights. The trial court concluded that respondent-mother's parental rights were subject to termination

based on all four grounds alleged by petitioners and further concluded that termination was in Kelly's best interest. Respondent-mother appeals.

The termination of parental rights proceeds in two stages, beginning with an adjudicatory determination. *See* N.C.G.S. § 7B-1109 (2019). "At the adjudicatory stage, the petitioner bears the burden of proving by 'clear, cogent, and convincing evidence' the existence of one or more grounds for termination under section 7B-1111(a) of the General Statutes." *In re A.U.D.*, 373 N.C. 3, 5–6 (2019) (quoting N.C.G.S. § 7B-1109(f)). "If a trial court finds one or more grounds to terminate parental rights under N.C.G.S. § 7B-1111(a), it then proceeds to the dispositional stage," *id.* at 6, at which it "determine[s] whether terminating the parent's rights is in the juvenile's best interest." N.C.G.S. § 7B-1110(a) (2019).

In her brief, respondent-mother challenges each of the four grounds for termination found by the trial court. We begin with the ground both parties agree was improper: that respondent-mother willfully left Kelly in a placement outside the home for more than twelve months without making reasonable progress toward correcting the conditions that led to her removal under N.C.G.S. § 7B-1111(a)(2). The Court of Appeals previously held, relying on our decision in *In re Pierce*, 356 N.C. 68 (2002),[2] that the "removal" contemplated by this ground "refers only to circumstances

---

[2] In *In re Pierce*, this Court concluded that the period of the twelve-month placement outside the home in N.C.G.S. § 7A-289.32(3) (current version at N.C.G.S. § 7B-1111(a)(2)) did not begin until the juvenile was the subject of an order issued by the juvenile court. 356 N.C. 68, 74 (2002).

where a court has entered *a court order* requiring that a child be in foster care or other placement outside the home." *In re A.C.F.*, 176 N.C. App. 520, 525–26 (2006). In support of this holding, the Court of Appeals explained:

> [A]n interpretation of "left . . . in foster care or placement outside the home" and "removal" in G.S. § 7B-1111(a)(2) that broadly covers circumstances where parents leave their children in others' care without regard to involvement of the juvenile court may lead to nonsensical results. There are an infinite variety of reasons parents decide to entrust their children's care to others. Oftentimes, these reasons will not implicate the child welfare concerns of the State. To allow the termination ground set forth in G.S. § 7B-1111(a)(2) to be triggered no matter what the cause for a child's separation from his parent is inconsistent with affording parents notice that they are at risk of losing their parental rights. Instead, it is logical that the General Assembly, in adopting G.S. § 7B-1111(a)(2), was primarily concerned with allowing termination where a juvenile court was involved in the "removal" of the child.

*Id.* at 525 (alteration in original). We find this reasoning persuasive and believe it applies with equal force to the circumstances of this case. Kelly entered petitioners' custody when respondent-mother agreed to a voluntary kinship placement. Although petitioners later obtained full custody of Kelly through a civil custody order, that order was entered under Chapter 50 of our General Statutes and not under Chapter 7B. A Chapter 50 civil custody order does not provide sufficient notice to a parent that their parental rights would be imperiled by their loss of custody or inform the parent what steps would be necessary to make reasonable progress and avoid

termination. Accordingly, we reverse the portion of the trial court's termination order that relies on this ground for termination.

The trial court also found that respondent-mother's rights were subject to termination based on dependency under N.C.G.S. § 7B-1111(a)(6). An adjudication under this ground requires the trial court to make two ultimate findings: (1) that the parent is incapable (and will continue to be incapable for the foreseeable future) of providing proper care and supervision to their child, rendering the child a "dependent juvenile" as defined by N.C.G.S. § 7B-101(9) (2019); and (2) that the parent lacks an appropriate alternative child care arrangement. N.C.G.S. § 7B-1111(a)(6); *see In re K.R.C.*, 374 N.C. 849, 859 (2020). Respondent-mother does not raise an argument with respect to the first required finding, and thus we do not discuss whether respondent-mother's alleged incapability rendered Kelly a dependent juvenile. But we agree with respondent-mother that the trial court failed to make the second required finding regarding an appropriate alternative child care arrangement, and thus its conclusion that dependency provides a ground for termination must be reversed. *See In re E.L.E.*, 243 N.C. App. 301, 308 (2015) (concluding that the failure to make a necessary termination finding requires reversal).

Petitioners argue that a finding regarding an alternative child care arrangement was unnecessary because respondent-mother "did not come forward with an alternative child care arrangement." However, the burden was on petitioners to show that respondent-mother lacked a suitable alternative child care arrangement,

and they presented no evidence to meet their burden. *See* N.C.G.S. § 7B-1109(f) ("The burden in [adjudicatory hearings on termination] shall be upon the petitioner or movant and all findings of fact shall be based on clear, cogent, and convincing evidence."). Respondent-mother was not questioned about potential alternative child care arrangements during her testimony, and no other witness addressed the issue. Since the trial court failed to make this required finding and no evidence was presented that would allow it to make such a finding, the portion of the trial court's order relying upon this ground for termination must be reversed. *See id.*

The trial court also found that termination was warranted based on neglect. Under N.C.G.S. § 7B-1111(a)(1), a trial court may terminate a parent's rights if that parent has neglected their child. A neglected juvenile is one "whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15). When it cannot be shown that the parent is neglecting his or her child at the time of the termination hearing because "the child has been separated from the parent for a long period of time, there must be a showing of past neglect and a likelihood of future neglect by the parent." *In re D.L.W.*, 368 N.C. 835, 843 (2016) (citing *In re Ballard*, 311 N.C. 708, 713–15 (1984)). "When determining whether such future neglect is likely, the district court must consider evidence of changed circumstances occurring between the period of past neglect and

the time of the termination hearing." *In re Z.V.A.*, 373 N.C. 207, 212 (2019) (citing *Ballard*, 311 N.C. at 715).

At the time of the termination hearing on 13 August 2019, Kelly had been out of respondent-mother's care for almost four years. Respondent-mother argues the trial court's findings fail to address the likelihood of future neglect if Kelly was returned to her care.[3] She acknowledges the trial court found that "[s]ince the minor child has been in the custody of the Petitioners, the Respondent-Mother's circumstances have not improved such that she would be able to provide proper care for the child" but argues that this finding is both inadequate to satisfy the two-part neglect test and unsupported by the evidence. Since we agree with respondent-mother that the record evidence does not support this finding of fact, we need not consider whether the finding, if adequately supported, demonstrated a likelihood of repetition of neglect.

At the time Kelly entered petitioners' care she was living with her parents, and her father was manufacturing methamphetamine in the family home. There is no dispute that Kelly's parents were no longer in a relationship and were living apart at the time of the termination hearing, and thus the circumstances which led respondent-mother to voluntarily place Kelly in petitioners' care were irrelevant to

---

[3] Respondent-mother does not contest that the circumstances which led to her voluntarily placing Kelly with petitioners and which eventually led to respondent-mother losing custody of Kelly to petitioners constituted past neglect.

her ability to provide care for Kelly at the time of the termination hearing. *See In re Young*, 346 N.C. 244, 248 (1997) ("Termination of parental rights for neglect may not be based solely on past conditions which no longer exist."). In order for the trial court's finding that respondent-mother was unable to provide proper care for Kelly to be viable, there must have been other evidence presented during the termination hearing to support it.

Two witnesses testified during the adjudicatory phase of the termination hearing. The first, Kelly's aunt, offered the following regarding respondent-mother's ability to provide care:

> Q. Do you currently have any concerns about [respondent-mother's] ability to take care of [Kelly]?
>
> A. I don't think that she would be able to take care of [Kelly].
>
> Q. Why do you believe that?
>
> A. I don't believe that she can because she can't, you know, keep her—she can't be in her own home. She don't have— she lives with her mom still. The only time that I knew that she was out of her mom's home is when she was with [the father].
>
> Q. Do you know why [respondent-mother] is living with her mother?
>
> A. I'm not sure.
>
> Q. Do you know if [respondent-mother's] mother is helping to take care of her?

A. To the best of my knowledge, possibly. I'm not living there so I really couldn't say.

Her responses on cross-examination further reflected her lack of knowledge regarding respondent-mother's disabilities.

Q. Now, you don't actually know—you testified believing that [respondent-mother] was mentally disabled. You don't actually know the details of her disability do you?

A. No, I do not.

Q. And, you don't actually have any frame of reference for whether or not she is capable of caring for a child in general do you?

A. No.

The other witness was respondent-mother, and she denied that her "disability would make it impossible . . . to provide at least some level of care for [Kelly]."

Between respondent-mother's clear assertion that she could provide care for Kelly and the paternal aunt's mere supposition about whether respondent-mother was capable of caring for Kelly, there is no clear, cogent, and convincing evidence to support the trial court's finding that "the Respondent-Mother's circumstances have not improved such that she would be able to provide proper care for the child." Accordingly, we will disregard this finding. *See In re N.G.*, 374 N.C. 891, 901 (2020) (disregarding findings of fact not supported by clear, cogent, and convincing

evidence). Without this finding, the trial court's order lacks any findings whatsoever that address the possibility of repetition of neglect.[4]

Moreover, the trial court's remaining findings of fact and the other evidence presented at the termination hearing do not suggest that Kelly would be neglected if returned to respondent-mother's care. The trial court found that respondent-mother lived with her own mother, her brother, and her two minor cousins in a two-bedroom apartment. There were neither findings nor testimony identifying any issues with the safety of respondent-mother's residence or mentioning any concerns with the family members living there. The trial court also found that respondent-mother relies on family members for "assistance in caring for herself" and for travel. But as she was living with the very family members she was relying on for assistance, it is unclear how respondent-mother's disabilities, standing alone, would place Kelly at risk of neglect if she returned to respondent-mother's care.

Although a lack of evidence showing the probable repetition of neglect forecloses termination of parental rights for most forms of neglect, this Court has recognized that the neglect ground can support termination without use of the two-part *Ballard* test if a parent is presently neglecting their child by abandonment. *In*

---

[4] The dissent argues that respondent-mother's disability, standing alone, is sufficient to show a likelihood of future neglect. The position proposed by the dissent would require a trial court to find a likelihood of future neglect whenever a parent is unable to care for him or herself, regardless of the level of support surrounding the parent. That is not the law of this state.

*re N.D.A.*, 373 N.C. 71, 81–82 (2019). Petitioners argue that the trial court's findings support a conclusion that respondent-mother neglected Kelly by abandoning her.

A trial court may terminate a parent's rights under the ground of neglect by abandonment when it finds that the parent has engaged in "wilful neglect and refusal to perform the natural and legal obligations of parental care and support." *Pratt v. Bishop*, 257 N.C. 486, 501 (1962). The trial court's findings in support of this ground must reflect "that the parent has engaged in conduct 'which manifests a willful determination to forego all parental duties and relinquish all parental claims to the child' as of the time of the termination hearing." *In re N.D.A.*, 373 N.C. at 81 (citation omitted). In deciding whether this ground exists, the trial court should consider the parent's conduct over an extended period, up to and including the time of the termination hearing. *Id.* at 81–82.

Here, the trial court found that while Kelly was in petitioners' care, respondent-mother never filed a motion seeking visitation, did not provide for Kelly's physical and financial needs, and wrote a Facebook message to petitioners in 2016 in which she stated she no longer wished to be a parent. But the trial court also found that respondent-mother (1) had four visits with Kelly prior to the filing of the civil custody action; (2) would send gifts to Kelly, usually around the time of her birthday; (3) sent $100 to petitioners for Kelly's care on one occasion in 2016; (4) had a video chat with Kelly on her fourth birthday; and (5) periodically communicated with petitioners on Facebook Messenger. Considering the totality of respondent-mother's

conduct up until the time of the termination hearing, respondent-mother did not "manifest[ ] a willful determination to forego all parental duties" while Kelly was in petitioners' care.[5] *Id.* at 81. By consistently providing gifts and repeatedly contacting Kelly and her caregivers over a long period of time, respondent-mother showed her intent to remain a part of Kelly's life. Therefore, the trial court's findings of fact affirmatively demonstrate respondent-mother did not neglect Kelly by abandonment, and consequently, the portion of the trial court's termination order relying on this ground must be reversed.

The final ground for termination found by the trial court was willful abandonment under N.C.G.S. § 7B-1111(a)(7). Under that provision, the trial court may terminate a parent's rights when said "parent has willfully abandoned the juvenile for at least six consecutive months immediately preceding the filing of the petition or motion." N.C.G.S. § 7B-1111(a)(7). Unlike neglect by abandonment, an adjudication under this ground requires specific focus on a parent's actions during "the six consecutive months preceding the filing of the petition." *In re N.D.A.*, 373 N.C. at 77 (citation omitted). But the trial court may also look outside the six-month window in order to evaluate the parent's "credibility and intentions." *Id.* (citation omitted).

---

[5] The trial court's order also fails to address whether respondent-mother's alleged abandonment of Kelly was willful, and it is also subject to reversal on this basis. *See In re N.D.A.*, 373 N.C. 71, 82–83 (2019).

In this case, the termination petition was filed on 12 March 2019, and thus the relevant period was from that date back until 12 September 2018. The trial court's findings and the evidence at the termination hearing reflect only one concrete action taken by respondent-mother during the determinative period: she provided Kelly "three boxes" of gifts for Christmas 2018. The trial court found that respondent-mother otherwise had no meaningful contact with Kelly and provided no financial assistance during the six-month period, and it also found that respondent-mother did not file a motion for visitation after petitioners were granted sole custody of Kelly. However, the trial court's findings do not address whether respondent-mother's conduct was willful.

Willful intent is a necessary component of abandonment, and, when adjudicating willful abandonment as a ground for termination under N.C.G.S. § 7B-1111(a)(7), the trial court must make adequate evidentiary findings to support its ultimate finding as to whether willful intent exists. *In re N.D.A.*, 373 N.C. at 78. There is no such ultimate finding here, and the trial court's termination order identifies multiple possible impediments to respondent-mother's ability to contact and provide support to Kelly. The trial court found that respondent-mother "has been diagnosed with bipolar disorder, oppositional defiant disorder, attention deficit disorder, and mental retardation" and that she "has an IQ in the range of 40–45." It also found that she lacked a driver's license, that she relied on her family and public transportation for travel, and that she lived in a different county than petitioners.

Finally, the trial court found that respondent-mother was unemployed and relied on supplemental security income. Nonetheless, the trial court's order makes no attempt to explore the interplay between these impediments and respondent-mother's intent. Moreover, while the trial court found that respondent-mother had no meaningful contact during the relevant six-month period, it also found that respondent-mother "sent some gifts to [Kelly], usually around the time of [Kelly's] birthday"; that respondent-mother "had Facetime communication" with Kelly on her fourth birthday, which occurred two days after the termination petition was filed; and that respondent-mother "used the social media platform Facebook and Facebook messenger to communicate periodically with the Petitioners," without discussing whether these actions had any relevance to respondent-mother's credibility and intentions. Taken together, the trial court's findings fail to show that respondent-mother "had a 'purposeful, deliberative and manifest willful determination to forego all parental duties and relinquish all parental claims to [Kelly].' " *Id.* at 79 (quoting *In re D.M.O.*, 250 N.C. App. 570, 573 (2016)). However, in light of the minimal contact between respondent-mother and Kelly during the relevant six-month period, the evidence may still support this ground for termination. *See In re C.B.C.*, 373 N.C. 16, 23 (2019) (establishing that efforts outside the six-month period do not preclude a finding of willful abandonment if nothing is done to maintain or establish a relationship during that period). Under these circumstances, the appropriate disposition is to reverse this part of the trial court's order and remand "for further

proceedings, including the entry of a new order containing findings of fact and conclusions of law addressing the issue of whether" willful abandonment existed. *In re K.N.*, 373 N.C. 274, 284 (2020) (citing *In re N.D.A.*, 373 N.C. at 84).

None of the grounds for termination found by the trial court were supported by sufficient findings of fact established by clear, cogent, and convincing evidence. The portions of the trial court's order concluding that respondent-mother's rights were subject to termination under N.C.G.S. § 7B-1111(a)(1), (2), and (6) are reversed. The portion of the trial court's order adjudicating grounds for termination under N.C.G.S. § 7B-1111(a)(7) is reversed and remanded for further proceedings not inconsistent with this opinion, including the entry of a new order containing proper findings and conclusions addressing the issue of whether respondent-mother willfully abandoned Kelly during the six months prior to the filing of the termination petition. The trial court may, in the exercise of its discretion, receive additional evidence on remand if it elects to do so. *See In re K.N.*, 373 N.C. at 285.

REVERSED IN PART; REVERSED AND REMANDED IN PART.

Justice NEWBY dissenting.

The standard for appellate review of these cases is well-settled. This Court should ask whether the trial court's findings are supported by clear, cogent, and convincing evidence and whether those facts in turn support the trial court's conclusions of law. *See In re E.H.P.*, 372 N.C. 388, 392, 831 S.E.2d 49, 52 (2019). This Court should not find facts, as it not positioned to make observations and determinations that a trial court can. Yet again, however, the majority of this Court chooses to ignore the facts found by the trial court to reach its desired outcome.

When the trial court order is viewed as a whole, it is clear that the trial court's findings of fact supported by clear, cogent, and convincing evidence ultimately support its decision to terminate respondent's rights based on, *inter alia*, neglect and willful abandonment.[1] Moreover, I would remand to the trial court to make the required finding on whether there was an alternative childcare placement for the termination ground of dependency. Therefore, I respectfully dissent.

The evidence at the termination hearing showed the following: The child was born on 14 March 2015. Around June of 2015, when the child was three months old, respondent learned that the child's father was making methamphetamine in the

---

[1] Because termination would be proper on any of these grounds, I do not address the trial court's decision to terminate respondent's parental rights based on N.C.G.S. § 7B-1111(a)(2). *See* N.C.G.S. § 7B-1111(a)(2) (2019); *In re A.R.A.*, 373 N.C. 190, 194, 835 S.E.2d 417, 421 (2019) ("[A] finding of only one ground is necessary to support a termination of parental rights . . . .").

mobile home they lived in with their daughter. Despite knowing that the child's father was manufacturing and using drugs in the home, respondent and the child continued to live in the mobile home with him until around October 2015, a little less than approximately five months after respondent discovered the child's father was manufacturing methamphetamine. The father and respondent got into a domestic dispute, leading respondent to contact DSS to seek assistance. Respondent told DSS about the meth lab and was not criminally charged. After respondent contacted DSS, the child's biological father was arrested and charged with felony drug offenses, including manufacturing methamphetamine; maintaining a dwelling for the use, storage, or sale of a controlled substance; trafficking methamphetamine; and misdemeanor child abuse. Following the father's arrest, DSS placed the child in petitioners' care and custody pursuant to a voluntary kinship placement. Petitioners are the child's paternal aunt and uncle. At the time that the child was placed with petitioners, she was not up to date on her vaccinations.

Eventually, on 8 January 2016, petitioners filed an action seeking sole legal and physical custody of the child. In April 2016, petitioners were granted custody of the child. In its order, the trial court held that respondent would have no visitation with the minor child until she petitioned the court to modify the custody order. Respondent did not appear at that hearing, nor did she ever file a motion to address visitation despite the court order allowing her to do so. While respondent visited the child four times between the child's voluntary kinship placement and petitioners

filing their custody action, respondent had no visitation with the minor child since the entry of the custody order.

On 12 March 2019, petitioners filed a petition to terminate respondent's parental rights. Respondent was appointed a guardian *ad litem* (GAL) for herself based on need. After receiving evidence and holding a termination hearing, the trial court made the following findings:

> 14. . . . . [Respondent] resides in a 2-bedroom apartment with her mother, her biological brother and two minor cousins.
>
> 15. The Respondent-Mother is not gainfully employed. She receives supplemental security income for disabilities diagnosed in her childhood. The Respondent-Mother has been diagnosed with bipolar disorder, oppositional defiant disorder, attention deficit disorder, and mental retardation. The Respondent-Mother has an IQ in the range of 40–45. The Court makes these findings based upon the Respondent-Mother's testimony, although no documentation was submitted supporting these diagnoses.
>
> 16. After the Petitioners were granted custody of the minor child, the Respondent-Mother sent some gifts to the minor child, usually around the time of the minor child's birthday.
>
> 17. In 2016, the Respondent-Mother sent the Petitioners one hundred ($100.00) dollars. Apart from this isolated payment, the Respondent-Mother has provided no financial support for the benefit of the minor child.
>
> 18. On or about the minor child's 4th birthday, the Respondent-Mother had Facetime communication with the child. The Respondent-Mother has used the social media platform Facebook and Facebook messenger to communicate periodically with the Petitioners.

19. On the date of the custody hearing in April 2016, the Respondent-Mother sent a vulgar message to the Petitioners through Facebook messenger insulting them and also stating she no longer wanted to be a parent to the minor child. The Respondent-Mother denied sending the message and asserted her Facebook account had been hacked. The Court admitted the messages into evidence over the objection of the Respondent-Mother's attorney.

20. The Respondent-Mother has never had a driver's license and relies on family members and public transportation for travel.

21. As a result of her psychological conditions and her mental limitations, the Respondent-Mother does not have the capability to provide for the proper care of the minor child. The Respondent-Mother needs assistance in caring for herself and has always depended on family members.

22. The Respondent-Mother has failed to provide for the minor child's physical and economic needs while she has been in the care of the Petitioners.

23. The Respondent-Mother neglected the minor child while the child was in her custody by failing to obtain proper medical care and exposing her to an environment where methamphetamine was manufactured.

24. During the six-months immediately preceding the filing of the petition to terminate her parental rights, the Respondent-Mother had no meaningful contact with the minor child and did not provide any financial support.

25. The Respondent-Mother has failed to perform her natural and legal obligations of support and maintenance for the minor child.

26. Since the minor child has been in the custody of the Petitioners, the Respondent-Mother's circumstances have not improved such that she would be able to provide proper care for the child.

Ultimately, the trial court concluded as a matter of law that respondent's rights should be terminated on, *inter alia*, grounds of neglect, N.C.G.S. § 7B-1111(a)(1), dependency, N.C.G.S. § 7B-1111(a)(6), and willful abandonment, N.C.G.S. § 7B-1111(a)(7).

First, the trial court properly terminated respondent's parental rights based on neglect. Subsection 7B-1111(a)(1) of the North Carolina General Statutes provides that a trial court may terminate a parent's parental rights when "[t]he parent has . . . neglected the juvenile." A neglected juvenile is defined in the North Carolina General Statutes as a child "whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; . . . or who lives in an environment injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15) (2019). To terminate a parent's rights based on neglect, one must "show[ ] . . . neglect at the time of the termination hearing or, if the child has been separated from the parent for a long period of time, there must be a showing of past neglect and a likelihood of future neglect by the parent." *In re D.L.W.*, 368 N.C. 835, 843, 788 S.E.2d 162, 167 (2016) (citing *In re Ballard*, 311 N.C. 708, 713–15, 319 S.E.2d 227, 231–32 (1984)). Neglect can also be shown through abandonment, and the determinative period for evaluating a parent's conduct is not limited to the six months preceding the petition's filing. *In re N.D.A.*, 373 N.C. 71, 81, 833 S.E.2d 768, 776 (2019).

In this case, there is no question that respondent allowed the child to live in a home where the child's biological father was manufacturing methamphetamine, clearly indicating a showing of past neglect. Though respondent was not living with the child's biological father at the time of the termination hearing, the trial court made several findings about respondent's current living situation, i.e., her sharing a two-bedroom apartment with four other family members, her inability to function without assistance based on her diagnosed disabilities, and her sole reliance on others for transportation, among other things. Ultimately, the trial court found that, though respondent no longer lived with the child's biological father, she "does not have the capability to provide for the proper care of the minor child" due to her inability to care for herself. This manifested itself initially, for example, in her failure to be able to ensure that the child received proper medical care before coming into petitioners' custody. These findings all indicate that because of respondent's limitations, it is likely respondent will neglect the child in the future, in addition to showing neglect based on abandonment due to respondent's failure to make meaningful contact with the child or provide financial support.

The majority rejects these trial court findings, instead reasoning that it did not believe that the mother's disabilities would place the child at risk of future neglect if the child were returned to respondent's care. The wisdom of this determination, however, is not for this Court to question. Instead, utilizing the proper standard of review, it is clear based on respondent's own testimony that the trial court's findings

of fact about past neglect of the child and respondent's own disabilities are supported by the record. The trial court certainly could conclude these limitations ultimately prevent respondent from taking care of herself, and even more, from taking care of the child. Thus, the trial court's decision to terminate respondent's parental rights based on neglect is supported by the findings and evidence.

Second, the trial court properly terminated respondent's parental rights based on subsection 7B-1111(a)(6), which provides for termination when

> the parent is incapable of providing for the proper care and supervision of the juvenile, such that the juvenile is a dependent juvenile within the meaning of G.S. 7B-101, and that there is a reasonable probability that the incapability will continue for the foreseeable future. Incapability under this subdivision may be the result of substance abuse, intellectual disability, mental illness, organic brain syndrome, or any other cause or condition that renders the parent unable or unavailable to parent the juvenile and the parent lacks an appropriate alternative child care arrangement.

N.C.G.S. § 7B-1111(a)(6) (2019).

Here there is no question that the trial court made findings on respondent's inability to care for the child. As discussed above, the trial court found that even after the child had been removed from the home, respondent was still unable to care for herself without the assistance of others. Specifically, "[s]ince the minor child has been in the custody of the Petitioners, the Respondent-Mother's circumstances have not improved such that she would be able to provide proper care for the child." This was based on her psychological conditions and mental limitations, manifested in the fact

that respondent had to depend on other family members for her own care, rendering it impractical for her to provide proper care for the child.

The majority nonetheless makes much about the fact that petitioners had the burden "to show that respondent-mother lacked a suitable alternative child care arrangement." Notably, at no point in the proceeding did respondent present an alternative childcare arrangement. Despite the majority's contention that petitioners bore the burden to show the lack of an alternative placement, case law has recognized that "[h]aving an appropriate alternative childcare arrangement means that the parent himself must take some steps to suggest a childcare arrangement." *In re L.H.*, 210 N.C. App. 355, 366, 708 S.E.2d 191, 198 (2011). While petitioners bear the burden generally to show that respondent's parental rights should be terminated, contrary to the majority's suggestion, the burden does not rest solely on petitioners to show that respondent offered no alternative childcare arrangement. Where, as here, respondent fails to present an alternative childcare arrangement, that fact must be taken into account. Instead of reversing the entire ground for termination as the majority does, this termination ground should be remanded to the trial court to make the proper finding of whether there was an alternative childcare arrangement.

Finally, the trial court properly terminated respondent's parental rights based on willful abandonment. Under N.C.G.S. § 7B-1111(a)(7), the trial court may terminate a parent's parental rights when "[t]he parent has willfully abandoned the

juvenile for at least six consecutive months immediately preceding the filing of the

petition or motion." N.C.G.S. § 7B-1111(a)(7).

> "Abandonment implies conduct on the part of the parent
> which manifests a willful determination to forego all
> parental duties and relinquish all parental claims to the
> child." *In re Young*, 346 N.C. [244,] 251, 485 S.E.2d [612,]
> 617 [(1997)] (citation omitted). "[I]f a parent withholds his
> presence, his love, his care, the opportunity to display filial
> affection, and wil[l]fully neglects to lend support and
> maintenance, such parent relinquishes all parental claims
> and abandons the child." *Pratt v. Bishop*, 257 N.C. 486, 501,
> 126 S.E.2d 597, 608 (1962) (citation omitted). "Whether a
> biological parent has a willful intent to abandon his child
> is a question of fact to be determined from the evidence."
> *In re Adoption of Searle*, 82 N.C. App. 273, 276, 346 S.E.2d
> 511, 514 (1986). "[A]lthough the trial court may consider a
> parent's conduct outside the six-month window in
> evaluating a parent's credibility and intentions, the
> 'determinative' period for adjudicating willful
> abandonment is the six consecutive months preceding the
> filing of the petition." *In re N.D.A.*, 373 N.C. 71, 77, 833
> S.E.2d 768, 773 (2019) (citation omitted).

*In re B.C.B.*, 374 N.C. 32, 35–36, 839 S.E.2d 748, 752 (2020) (alterations in original).

Because petitioners filed the termination petition on 12 March 2019, the

determinative period spans from 12 September 2018 to 12 March 2019. The trial court

determined that during this period respondent had no meaningful contact with the

minor child and did not provide financial support. Despite the trial court's order in

the custody action allowing petitioner to petition the trial court to modify the order

to allow for visitation privileges, the trial court's order here expressly indicates that

respondent never filed any motion to address visitation, nor has she had any

visitation with the child since the entry of the custody order. Moreover, the trial court explicitly found that other than one isolated $100 payment in 2016, three years before the filing of the termination petition, respondent failed to provide financial support for the minor at any other time, including within the determinative six-month period. When viewed as a whole and combined with the findings that respondent cannot properly care for the child based on her own limitations and inability to care for herself without assistance, the trial court's findings support its conclusion that respondent willfully abandoned the child.

The majority, however, faults the trial court for failing to use the word "willful" in its findings and, in its view, for failing to link its findings to its conclusion that respondent willfully abandoned the child. Instead, the majority cites to respondent's actions outside of the determinative six-month window to support its conclusion that the trial court's findings here were insufficient. It remands to the trial court to make a clearer connection between its factual findings and its determination that willful abandonment existed as a ground to terminate respondent's parental rights. This is unnecessary, however, since the trial court considered the evidence before it, evaluated respondent's lack of meaningful contact and lack of support during the determinative six-month period, and evaluated all facts before it to reach its conclusion. Respondent's inability to care for herself and her failure to make any meaningful contact or provide support during the determinative period show that

respondent's conduct met the required statutory ground to terminate her parental rights based on willful abandonment.

Under the proper standard of review, the trial court's decision to terminate respondent's parental rights based on neglect and willful abandonment was supported by its findings and the evidence. I would remand to the trial court to make the required finding on whether there was an alternative childcare placement for the termination ground of dependency. Thus, I respectfully dissent.