IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-131

No. 523A20

Filed 5 November 2021

IN THE MATTER OF: C.K.I.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from order entered 5 October 2020 by Judge Robert P. Trivette in District Court, Dare County. This matter was calendared in the Supreme Court on 30 September 2021 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*No brief filed for petitioner-appellee mother.*

*No brief filed for appellee Guardian ad Litem.*

*Edward Eldred for respondent-appellant father.*

HUDSON, Justice.

Respondent, the father of the minor child, C.K.I. (Charlie),[1] appeals from the trial court's order terminating his parental rights on the ground of willful abandonment. We affirm.

## I.    Factual and Procedural Background

Petitioner and respondent were in a relationship that began during the

---

[1] A pseudonym is used throughout the opinion to protect the child's identity and for ease of reading.

summer of 2013 but never married. The relationship suffered from substance abuse and domestic violence. Charlie was born in February 2014. The couple lived together for a month after Charlie's birth, then separated. Following a domestic incident between petitioner and respondent on 4 March 2014 during which Charlie was present, the Dare County Department of Social Services (DSS) initiated an assessment for child neglect. DSS recommended counseling and informed the parents that the child should have a sober caregiver at all times and should not be exposed to acts of domestic violence. DSS also responded to incidents of domestic violence in April and June 2014.

¶ 3    Following a 5 June 2014 incident, DSS made a safety resource arrangement with Charlie's maternal grandfather and step-grandmother who agreed that the minor child would stay in their home until DSS determined otherwise. DSS referred the parents to mental health and substance abuse counseling. Initially, the parents were not consistent with their counseling, were unable to maintain appropriate housing for an infant, failed to address issues related to domestic violence, and failed to demonstrate an ability to provide food, clothing, and shelter for the minor child. On 18 September 2014, DSS filed a juvenile petition alleging the minor child was a neglected juvenile. By January 2015, petitioner resided with Charlie's maternal grandmother. Respondent resided with his sister. Charlie continued to reside with his maternal grandfather and step-grandmother. Following a 28 January 2015

hearing, the trial court entered a dispositional order on 23 February 2015 in which it adjudicated Charlie a neglected juvenile and granted custody to the maternal grandfather and step-grandmother. The matter was converted to a Chapter 50 action, and DSS was relieved of further responsibility. The court ordered that petitioner and respondent have separate weekly supervised visitation for two hours.

Following the court's 23 February 2015 dispositional order, petitioner "substantially changed her life." She established a safe, stable, and appropriate residence and maintained a steady job which provided the means and ability to provide financially for the minor child. By April 2017, petitioner had provided for the child's basic needs for over a year, and the child had been living with her for more than six months. With the support of maternal grandfather and step-grandmother, petitioner petitioned for custody of the minor child. Respondent was served with notice of the custody hearing but failed to appear or make any communication with the court regarding the matter. By order entered 12 April 2017, the trial court concluded that it was in the best interests of the minor child that petitioner be granted custody, and the court awarded petitioner sole legal and physical custody of the minor child.

On 6 November 2019, petitioner filed a petition for termination of respondent's parental rights. Petitioner alleged that grounds existed to terminate respondent's parental rights on grounds of neglect and abandonment. Petitioner alleged that

respondent had not seen the minor child since he was four months old and had not provided medical care or financial support for the child since he was one month old. Moreover, petitioner alleged that respondent has no relationship with the minor child and had not pursued a relationship since March 2014.

¶ 6 Respondent answered the petition to terminate his parental rights denying petitioner's allegations regarding grounds to terminate his parental rights. The court appointed a guardian ad litem for the minor child on 22 January 2020. A hearing on the matter took place on 25 September 2020 during which the court heard testimony from petitioner, the maternal grandfather, the maternal grandmother, Charlie's half-sibling's paternal grandmother, petitioner's boyfriend, respondent, respondent's girlfriend, and the guardian ad litem. On 5 October 2020, the trial court entered its order concluding that grounds existed to terminate respondent's parental rights and that termination was in the best interests of the child. Respondent appeals.

## II. Analysis

¶ 7 Our Juvenile Code provides a two-stage process for terminating parental rights. N.C.G.S. §§ 7B-1109, -1110 (2019). At the initial or adjudicatory stage, the burden is on the petitioner to establish the existence of any ground for termination alleged under N.C.G.S. § 7B-1111(a) based on clear, cogent, and convincing evidence. N.C.G.S. § 7B-1109(e)–(f) (2019). "We review a trial court's adjudication under N.C.G.S. § 7B-1109 'to determine whether the findings are supported by clear, cogent

and convincing evidence and the findings support the conclusions of law.' " *In re C.B.C.*, 373 N.C. 16, 19 (2019) (quoting *In re Montgomery*, 311 N.C. 101, 111 (1984)). "[F]indings of fact are binding 'where there is some evidence to support those findings, even though the evidence might sustain findings to the contrary.' " *In re R.D.*, 376 N.C. 244, 258 (2020) (quoting *In re Montgomery*, 311 N.C. at 110–11). "Unchallenged findings are deemed to be supported by the evidence and are 'binding on appeal.'" *In re K.N.K.*, 374 N.C. 50, 53 (2020) (quoting *In re Z.L.W.*, 372 N.C. 432, 437 (2019). "The trial court's conclusions of law are reviewable de novo on appeal." *In re J.D.C.H.*, 375 N.C. 335, 337 (2020) (quoting *In re C.B.C.*, 373 N.C. at 19).

Respondent contends that the trial court erred by terminating his parental rights on the grounds of neglect and willful abandonment. Respondent does not challenge the trial court's findings of fact, rather he argues the evidence presented does not support the trial court's conclusions on either ground. Because a single ground for terminating parental rights is sufficient to support a termination order, this Court can uphold the trial court's order based on one ground without reviewing any remaining ground. *In re J.S.*, 374 N.C. 881, 815 (2020).

A court may terminate parental rights upon a finding that "[t]he parent has willfully abandoned the juvenile for at least six consecutive months immediately preceding the filing of the petition or motion[.]" N.C.G.S. § 7B-1111(a)(7) (2019). "The most frequently approved definition is that abandonment imports any willful or

intentional conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child." *Pratt v. Bishop*, 257 N.C. 486, 501 (1962); *see also In re N.M.H.*, 375 N.C. 637, 642 (2020). "Whether a biological parent has a willful intent to abandon his child is a question of fact to be determined from the evidence." *In re B.C.B.*, 374 N.C. 32, 35 (2020) (quoting *In re Adoption of Searle*, 82 N.C. App. 273, 276 (1986)). "Although the trial court may consider a parent's conduct outside the six-month window in evaluating a parent's credibility and intentions, the 'determinative' period for adjudicating willful abandonment is the six consecutive months preceding the filing of the petition." *In re N.D.A.*, 373 N.C. 71, 77 (2019) (quoting *In re D.E.M.*, 257 N.C. App. 618, 619 (2018)). "If a parent withholds his presence, his love, his care, the opportunity to display filial affection, and willfully neglects to lend support and maintenance, such parent relinquishes all parental claims and abandons the child." *In re J.D.C.H.*, 375 N.C. 335, 338 (2020) (cleaned up).

¶ 10        Here, the determinative six-month period is from 6 May to 6 November 2019. In support of its conclusion that grounds exist to terminate respondent's parental rights based on willful abandonment, the trial court made the following unchallenged findings of fact:

> 13.    The parties lived together for periods of time prior to the birth of the juvenile. They lived together for about a month after the birth of the juvenile at the home of Petitioner's mother. There was domestic

violence and substance abuse issues in the relationship. [DSS] took non-secure custody of the juvenile and placed the juvenile with Petitioner's father. The juvenile matter was converted to a Chapter 50 Order giving custody to the [minor child's] maternal grandfather. Petitioner later filed a motion to modify that Chapter 50 Order and was granted custody as previously set forth.

14. Respondent was slightly involved at birth. He attended at least one pre-natal appointment and was present at the birth. He helped to set up the juvenile's nurse[r]y at Petitioner's mother's home. Once [DSS] became involved, Respondent's involvement dwindled off and he was non-compliant with his case plan with the Department.

15. Since the juvenile was one month old, the Respondent has provided no support, either monetary or in-kind and he has not paid for medical care nor attended any medical appointments for the juvenile. The Respondent last saw the juvenile when the child was 4–6 months old. Since the juvenile was one month old, he has purchased or provided no birthday gifts or Christmas gifts and has not acknowledged those holidays in any fashion for the minor child.

16. Testifying on Petitioner's behalf, her father and mother confirmed that Respondent only visited initially when the juvenile was living with Petitioner's mother and that while the juvenile resided with Petitioner's father, the Respondent did not visit. Both also confirmed that Respondent had provided no support, cards, or gifts that they were aware of and Respondent had never contacted either one of them to try to have contact with the juvenile.

. . . .

18. The Respondent admittedly had a terrible addiction to opioids. His criminal record was introduced with[out] objection from Dare and Currituck Counties which showed a variety of criminal convictions involving drugs as well as a misdemeanor conviction for tampering with a motor vehicle and for resisting an officer. He was convicted in Virginia for felony possession with intent to sell and deliver a Schedule I substance, heroin. Between his local jail time and his prison time in Virginia, he was incarcerated from October 2016 to July 2019. He also was in jail in North Carolina for periods of time prior to that.

19. There was conflicting testimony regarding Respondent's contact with Petitioner while he was incarcerated. . . . [T]he Court finds that Respondent contacted Petitioner one time in December 2018. Petitioner asked Respondent to agree for the juvenile's last name to be changed. Respondent disagreed and indicated he had a prison lawyer who told him all he had to do was file for custody when he was released and that he would get shared custody of the child and that he intended to do that. The parties argued and then hung up.

20. Despite indicating he was aware he could file an action to receive custody, Respondent has never filed an action to receive custody or visitation.

21. Respondent was released from prison in July 2019. Petitioner learned that he was out of prison via Facebook as he did not contact her or try to see the juvenile. Petitioner contacted Respondent's grandmother to determine if he was out of prison and then Respondent contacted Petitioner from the grandmother's phone. Petitioner again asked him to agree to change the child's last name. He refused and indicated his intent to see the juvenile. Yet, he never followed through in any way with this intent

prior to the filing of the termination of parental rights action.

22. While Respondent was incarcerated, Petitioner kept in contact with his grandmother. She visited with the juvenile on occasion, and sent gifts and cards signed by her on the juvenile's birthdays and Christmas. On one occasion when she was unable to see the child, she sent a card and a money card so he could buy a present for himself. She never indicated to Petitioner that the money card, gifts, or cards were from Respondent. Although Respondent asserts that the gifts and money provided by his grandmother were from him, there is no evidence to support such an assertion. Thus, the Court finds those items to be from the grandmother.

23. Respondent had a conduit to send money, cards, letters or gifts to the juvenile from himself. He could have written letters to the child to show his interest and even if Respondent would not have accepted the letters, his grandmother could have saved them to prove his interest. He failed entirely to do anything to support or show interest in the juvenile.

24. Petitioner never filed a child support action but she also never told Respondent or his grandmother that she would not accept support, money, or gifts for the juvenile. Both parties testified that Petitioner accused Respondent of never having supported the juvenile and having told Respondent that if he had gifts for the child, he should send them to him. Respondent failed to send support, money or gifts.

25. Based upon Respondent's lack of involvement throughout the juvenile's life, his apparent lack of interest during his incarceration and his failure to affirmatively do anything to assert his parental rights before the filing of this action, there is a reasonable probability that his lack of involvement

would continue.

26.  Petitioner did not encourage Respondent to have contact with the juvenile. She told him to forget about the juvenile. Petitioner tried to keep in contact with Respondent's sister but she was rebuffed. Respondent's father died prior to Respondent's incarceration and his mother was never involved with the juvenile. Petitioner did keep in touch with Respondent's grandmother . . . .

27.  Between the time the parties spoke in August 2019 and filing of the action in November 2019, Respondent did not attempt to see the juvenile. He provided no support of gifts. He showed no further interest. He did not file an action to establish a relationship with the juvenile. After the termination of parental rights action was filed, Respondent was served and he established his relationship with his court appointed attorney. He began contacting Petitioner in early 2020.

28.  The parties set up a meeting in March 2020 because Respondent wanted Petitioner to see for herself that he had changed. . . . Respondent did not show up at the meeting set up between the parties. Thereafter, Petitioner answered few of Respondent's texts and he did not call her. Petitioner eventually blocked Respondent's number on her phone. Petitioner did not encourage Respondent's desire to have contact with the juvenile and did not allow such. (All of this exchange occurred months after the termination action was filed.)

29.  The juvenile does not know who the Respondent is. He has not seen his father since he was 4–6 months old. From that time until the Respondent was incarcerated, Respondent did not attempt to contact the juvenile or the Petitioner and showed no interest. There is no bond between the Respondent

> and the juvenile. The juvenile considers Petitioner's boyfriend to be his father as he has raised him since he was 10 months old.
>
> 30.    The Petitioner lives . . . at the address listed on the petition for termination of parental rights. Respondent claims to have only learned her address at the hearing but admitted was served with the petition on November 7, 2019 and that he read the petition (which contained Petitioner's address) . . . .

¶ 11    Respondent argues that the findings do not support a conclusion of his abandonment for three reasons. First, while he did not initiate adversarial legal proceedings to force petitioner to allow respondent to see the minor child, respondent took steps toward that goal. As stated in his brief to this Court, respondent called petitioner and said "(1) he wanted to be involved in Charlie's life, (2) he was going to see Charlie, and (3) he was going to be a father to Charlie."

¶ 12    Second, after petitioner refused to allow respondent to see the minor child, she asked respondent to sign papers allowing her to change the minor child's name. However, as respondent contends, petitioner could have petitioned to change the minor child's name without his consent if she believed respondent had abandoned the minor child. By asking respondent's consent to change the minor child's name, respondent contends, petitioner evidenced a belief that respondent did not abandon the minor child.

¶ 13    Third, respondent refused to sign papers allowing petitioner to change the minor child's name. In sum, respondent argues that this is not a case of a parent

doing nothing for six months preceding the filing of a termination action, but one of a parent who asserted his intent to be a father to his son without aggressively inserting himself into his son's life immediately after completing three years in prison. We disagree.

¶ 14    "[I]f a parent withholds his presence, his love, his care, the opportunity to display filial affection, and wil[l]fully neglects to lend support and maintenance, such parent relinquishes all parental claims and abandons the child." *Pratt*, 257 N.C. at 501; *see also In re Apa*, 59 N.C. App. 322, 324 (1982) (affirming an order terminating parental rights of the father based on abandonment where the court's unchallenged findings provided that "except for an abandoned attempt to negotiate visitation and support, respondent 'made no other significant attempts to establish a relationship with [the minor child] or obtain rights of visitation with [the minor child].' ").

¶ 15    Here, the court's findings demonstrate that respondent had not seen the minor child, born in February 2014, since the minor child was four-to-six months old. Since the child was four-to-six months old but prior to respondent's three-year incarceration, respondent did not contact the minor child. While incarcerated, respondent had a conduit to the minor child through respondent's grandmother but nevertheless failed to send money, gifts, cards, or letters to the minor child. Upon his release from prison and prior to the filing of the termination petition, respondent made no attempt to communicate with the minor child. Despite repeated statements

that he intended to petition the courts for custody and visitation, respondent failed to do so. These facts evidence the lack of care, support, and maintenance that indicate abandonment. Accordingly, we uphold the trial court's conclusion that respondent willfully abandoned the minor child and clear, cogent, and convincing evidence supports the termination of respondent's parental rights. *See* N.C.G.S. § 7B-1111(a)(7).

Respondent does not challenge the trial court's dispositional determination that it was in the minor child's best interests that respondent's parental rights be terminated. Therefore, we affirm the trial court's order terminating respondent's parental rights.

AFFIRMED.